23 F.3d 855
 73 A.F.T.R.2d 94-2046, 17 Employee Benefits Cas. 2777
 William J. ELMORE; Wayne Comer, individually and as
representatives of a class of Plaintiffs similarly
situated, Plaintiffs-Appellees,
v.
CONE MILLS CORPORATION; Cone Mills Acquisition Corporation;
Dewey L. Trogdon; Lacy G. Baynes, Defendants-Appellants,
and
Paul W. Stephanz; Wachovia Bank and Trust Company, N.A.,
Defendants.
Robert B. Reich, Secretary of Labor, Amicus Curiae (Three Cases).
William J. ELMORE; Wayne Comer, Individually and as
representatives of a class of Plaintiffs similarly
situated, Plaintiffs-Appellants,
v.
CONE MILLS CORPORATION; Cone Mills Acquisition Corporation;
Dewey L. Trogdon; Lacy G. Baynes, Defendants-Appellees,
and
Paul W. Stephanz; Wachovia Bank and Trust Company, N.A.,
Defendants.
Robert B. Reich, Secretary of Labor, Amicus Curiae.
 Nos. 92-1362, 92-1363, 92-1404 and 92-1482.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 8, 1994.
Decided May 6, 1994.
 
 ARGUED: John Robbins Wester, Robinson, Bradshaw & Hinson, P.A., Charlotte, NC, for appellants. James R. Gilreath, Greenville, SC, for appellees. Stacey Eden Elias, Trial Atty., U.S. Dept. of Labor, Washington, DC, for amicus curiae. ON BRIEF: David C. Wright, III, Robinson, Bradshaw & Hinson, P.A., Charlotte, NC; Robert O. King, Kristofer K. Strasser, Ogletree, Deakins, Nash, Smoak & Stewart, Greenville, SC; Robert J. Lawing, Jane C. Jackson, Robinson, Maready, Lawing & Comerford, Winston-Salem, NC, for appellants. J. Kendell Few, Greenville, SC; John P. Freeman, Columbia, SC; for appellees. Thomas S. Williamson, Jr., Sol. of Labor, Marc I. Machiz, Associate Sol., Karen Handorf, Counsel for Special Litigation, U.S. Dept. of Labor, Washington, DC, for amicus curiae.
 Before WIDENER, HALL, PHILLIPS, MURNAGHAN, WILKINS, NIEMEYER, LUTTIG, WILLIAMS, MICHAEL, Circuit Judges, and SPROUSE, Senior Circuit Judge, en banc.
 Affirmed in part, reversed in part, and remanded by published opinion. Judge WILLIAMS wrote the majority opinion, in which Judges WIDENER, K.K. HALL, PHILLIPS, MURNAGHAN, WILKINS, NIEMEYER, LUTTIG and MICHAEL, and Senior Judge SPROUSE concur. Judge MURNAGHAN wrote a separate concurring opinion, in which Judges K.K. HALL and MICHAEL and Senior Judge SPROUSE join. Judge WILKINS wrote a separate concurring opinion, in which Judges NIEMEYER and WILLIAMS join. Judge NIEMEYER wrote a separate opinion concurring in part and dissenting in part, in which Judges LUTTIG and WILLIAMS join.
 OPINION
 WILLIAMS, Circuit Judge:
 
 
 1
 The primary issue presented by these cross-appeals is whether representations made by Cone Mills prior to the adoption of an Employee Stock Ownership Plan (ESOP), but not incorporated into the formal plan documents, are enforceable against Cone Mills under ERISA. The district court held that the representations were enforceable as part of the 1983 ESOP, an ERISA covered plan, and that Cone Mills and the other Defendants had breached their fiduciary duties to Plaintiffs under ERISA by failing to abide by the representations. In the alternative, and subject to proof of detrimental reliance, the district court held that Plaintiffs could recover under principles of equitable estoppel and as third-party beneficiaries of a contract between Defendants and their banks.[1]
 
 
 2
 A divided panel of this court reversed the judgment of the district court and rejected the alternative theories of recovery in Elmore v. Cone Mills, 6 F.3d 1028 (4th Cir.1993). The original panel majority affirmed the district court's rulings for Defendants on preemption, stock valuation, and other breach of fiduciary duty claims challenged by Plaintiffs in their cross-appeal. Thereafter, a majority of this court granted Plaintiffs' petition for rehearing, ordering that the earlier panel opinion be vacated and the case reheard by the court en banc. Elmore v. Cone Mills, No. 92-1362, 1993 U.S.App. LEXIS 33294 (4th Cir. Dec. 13, 1993). The en banc court now unanimously reverses the judgment of the district court that the representations are enforceable under ERISA as a plan or part of a plan, but, by an equally divided court, affirms the alternative theory of recovery that the representation created an enforceable obligation under a federal common law theory of equitable estoppel, subject to proof of detrimental reliance on remand. In all other respects, the en banc court unanimously affirms the rulings of the district court.
 
 I.
 
 3
 In response to a hostile takeover bid announced on October 31, 1983, a group of senior management employees at Cone Mills Corporation decided to gain control of the company through a leveraged buy-out (LBO), which became final on March 27, 1984. While planning and implementing the LBO, Dewey Trogdon, Cone Mills's Chairman of the Board and Chief Executive Officer, communicated regularly with Cone Mills's employees through various letters, office memoranda, and video presentations. Many of these communications were addressed to concerns expressed by employees regarding the impact the LBO would have on their pension benefits. The recurring themes of these communications were that management would protect the interests of Cone Mills's employees and shareholders and would keep the employees informed of any changes occurring because of the LBO.
 
 
 4
 The specific representation at issue in this case occurred in a letter sent by Dewey Trogdon to all Cone Mills's salaried employees on December 15, 1983, regarding management's proposed LBO. This letter explained that the Company had over-funded the existing Employee Retirement Plan (ERP), resulting in more funds being in the ERP accounts than were necessary to pay for accrued benefits. By the terms of the ERP, Cone Mills was entitled to any pension reversion surplus. Regarding the expected pension reversion surplus, the letter continued:
 
 
 5
 [i]f the management and bank proposal to buy the Company is successful, there is agreement among management and the banks that we will contribute the surplus, or its equivalent in Company stock, to the ESOP. When the transaction is executed and the contribution is made, you, I, and all other Cone employees will "take title" to a substantial asset in which we currently have no rights or ownership.
 
 
 6
 (J.A. at 3700.) On page two of the letter, Trogdon specifically stated: "As we get more time, we will answer your questions and publish information to the extent that it can be done on a legal and factual basis. We are, however, giving you information now based on our present plans which are subject to revision to meet changing situations." (J.A. at 3701.)
 
 
 7
 In an earlier December 12, 1983, letter to all Cone Mills employees, Trogdon had stated that their "pension plans [would] be left in place with [their] existing benefits guaranteed by the Company," and that, through the coordination of the 1983 ESOP and the ERP, the employees could "receive no less than the full amount" of their pre-LBO pension benefits. (J.A. at 3695 (emphasis omitted).) This letter also noted that "[t]ogether, the ESOP and your pension plan are expected to provide greater financial security than your present retirement benefits." (Id.) Trogdon estimated in the December 12th letter that over $50 million in stock could be contributed to the 1983 ESOP in the first two years but expressly noted that he could not legally guarantee that amount.
 
 
 8
 Subsequent to these letters, but prior to the actual vote on the LBO, Cone Mills communicated regarding the 1983 ESOP through a bulletin board notice, a February 1984 video presentation, a February 23 proxy statement to all salaried employees, and a March 15 memorandum from Trogdon. The bulletin board notice outlined the 10%/10%/1% contribution levels for the 1983 and 1984 plan years of the ESOP and emphasized the discretionary nature of additional contributions. The February video presentation referred to an expected contribution amount of over $50 million. A question-and-answer booklet distributed after the video presentation contained the same estimation that "if all goes according to plan, over $50 million of stock will be contributed to the ESOP for the years 1983 and 1984. After 1984, the company's contribution will be determined by the Board of Directors based on business conditions and company profits." (J.A. at 3925.) The question-and-answer booklet further notified the employees in bold-faced type that "[t]he legal documents control, and if this material differs in any way from the legal documents, the correct source of the information is the legal documents." (J.A. at 3911.)
 
 
 9
 The February 23 proxy statement, sent to salaried employees as participants in the PAYSOP, reiterated the 10%/10%/1% contribution formula as the mandatory ESOP contribution obligation of the Company. In addition, in response to some expressed disappointment and concern of salaried employees regarding the ESOP, Trogdon sent a memorandum to salaried employees on March 15, 1984. In this memorandum, Trogdon referred to the profit sharing potential of the ESOP, but made no guarantee of its success. Trogdon also stated: "I do not believe it is prudent, presently, to guarantee ESOP contributions above the 1% minimum for years 1985 and forward...." (J.A. at 4034.)
 
 
 10
 The LBO was approved by a nearly unanimous vote of the shareholders on March 26, 1984, and all shares of common stock, including the shares held by the previous employee stock ownership plan (the PAYSOP)[2], were purchased for $70 per share.
 
 
 11
 The 1983 ESOP plan documents were executed by Lacy Baynes[3] on April 2, 1984. The plan documents required the company to contribute cash, stock or other property worth ten percent of each covered employee's compensation for each of the first two years of the 1983 ESOP's operation and one percent of each employee's compensation for each year thereafter (the 10%/10%/1% formula). The executed documents did not refer to the pension surplus but did provide for discretionary contributions.
 
 
 12
 Between May and December of 1985, Cone Mills received the pension reversion surplus, which had increased in value to $69 million.[4] The district court found that from March 1984 through September 1985 Cone Mills contributed junior preferred stock valued at $54,796,638[5] to the 1983 ESOP. The gravamen of Plaintiffs' claims is that Cone Mills did not contribute the entire pension reversion surplus to the 1983 ESOP. Based primarily on the December letters, Plaintiffs claim they are entitled to have the full amount of the pension reversion surplus contributed to the 1983 ESOP, approximately $14 million more than Cone Mills's actual contribution.
 
 II.
 
 13
 ERISA imposes certain duties upon plan fiduciaries, breaches of which are actionable by any plan participant. 29 U.S.C.A. Secs. 1104, 1109(a), 1132(a)(2) (West 1985 & Supp.1993). The district court concluded that the Defendants, as plan fiduciaries, breached their duties to carry out the responsibilities of their offices solely in the interest of the plan participants " 'for the exclusive purpose of ... providing benefits to participants ... in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title or Title IV.' " 29 U.S.C.A. Sec. 1104(a)(1) (West Supp.1993). The district court's conclusion was based on its determination that the governing "documents" and "instruments" of the 1983 ESOP included the representation regarding the pension reversion surplus in the December 15th letter, because it constituted a clear and unambiguous promise of benefits that was formal, authorized, and ratified. The district court reasoned, therefore, that ERISA's fiduciary duty principles required Defendants to provide benefits in accordance with the pension reversion surplus representation as part of the plan documents.[6]
 
 
 14
 We reject the district court's determination that the representation regarding the pension reversion surplus was part of the 1983 ESOP plan. Under ERISA, plan fiduciaries must provide benefits only "in accordance with the documents and instruments governing" the employee pension benefit plan. 29 U.S.C.A. Sec. 1104(a)(1)(D) (emphasis added); see also Dzinglski v. Weirton Steel Corp., 875 F.2d 1075, 1080 (4th Cir.) ("To adhere to the plan is not a breach of fiduciary duty."), cert. denied, 493 U.S. 919, 110 S.Ct. 281, 107 L.Ed.2d 261 (1989). It is undisputed that the surplus representation was not incorporated into the written terms of the 1983 ESOP plan documents adopted by Defendants on April 2, 1984. Instead, the actual plan documents only mandated that Cone Mills provide benefits under the 10%/10%/1% formula.
 
 
 15
 Nonetheless, the district court found that an employer representation not contained in the formal plan documents could become a part of the plan if the promise to provide benefits was contained in a written, formal, authorized, and ratified statement sent by the employer's CEO to all of the employer's salaried employees.[7] In reaching its conclusion, the district court applied the inverse logic of our holding in Pizlo v. Bethlehem Steel Corp., 884 F.2d 116 (4th Cir.1989). In Pizlo, we held that a plaintiff does not have a cause of action for benefits under ERISA when such benefits were promised in informal and unauthorized amendments to the benefit plan. Id. at 120. We did not state, however, that employees are entitled to recover benefits under any written statement made by a company official, even if authorized and ratified.
 
 
 16
 On the contrary, only representations adopted in accordance with the amendment procedures outlined in the formal plan documents will suffice to incorporate the promised benefits into the plan. Miller v. Coastal Corp., 978 F.2d 622, 624 (10th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1586, 123 L.Ed.2d 152 (1993). Under the formal plan documents of the 1983 ESOP, no amendment is effective unless the Cone Mills Board of Directors executes a written document containing the amendment, the document is delivered to the plan trustee, and the trustee endorses receipt of the amendment. Even though the Cone Mills Board of Directors generally ratified Trogdon's actions and communications with Cone Mills employees, there is no evidence in the record that any written terms regarding the surplus claim were ever delivered to Baynes as trustee or endorsed by him. Therefore, the representation regarding the pension reversion surplus is not enforceable as a valid plan amendment to the 1983 ESOP.
 
 
 17
 Nor does the representation constitute an informal ERISA plan. Some courts have allowed employees to recover promised benefits that are not contained in a formal written plan document if the benefits are contained in an informal benefit plan. See e.g., Donovan v. Dillingham, 688 F.2d 1367, 1372 (11th Cir.1982) (en banc). In Donovan, the Eleventh Circuit held that an informal ERISA plan has been established "if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." Id. at 1373. The informal plan must, however, actually be in existence; the mere decision to create an employee benefit plan is not actionable. James v. National Business Sys., Inc., 924 F.2d 718, 720 (7th Cir.1991); Moeller v. Bertrang, 801 F.Supp. 291, 293 (D.S.D.1992). An informal plan may exist independent of, and in addition to, a formal plan as long as the informal plan meets all of the elements outlined in Donovan. See Henglein v. Informal Plan for Plant Shutdown Benefits for Salaried Employees, 974 F.2d 391, 400 (3d Cir.1992) (absence of integration clause in a formal plan and distribution of informal documents may lead the court to find that an informal plan existed in addition to the formal plan).
 
 
 18
 Applying these criteria, the surplus claim clearly does not constitute an informal plan existing independent of the 1983 ESOP. Although the first three Donovan elements (the intended class of beneficiaries, the intended benefits, and the source of the funding) arguably may be ascertainable from the December 12th and 15th letters, these letters do not satisfy the fourth element (the procedure for receiving benefits). The only way an employee could ascertain the procedures for obtaining benefits would be to refer to the 1983 ESOP formal plan document, which was not adopted until April 2, 1984. Therefore, the letters from Trogdon which are the basis of the surplus claim cannot constitute an informal ERISA plan that entitles Plaintiffs to benefits in lieu of or in addition to the 10%/10%/1% mandatory contributions contained in the 1983 ESOP.
 
 
 19
 Our conclusion that Plaintiffs are not entitled to any relief under the Donovan analysis is supported by the Ninth Circuit's decision in Carver v. Westinghouse Hanford Co., 951 F.2d 1083 (9th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 3036, 120 L.Ed.2d 905 (1992). In Carver, several independent companies that operated separate pension plans for their employees were consolidated into one company (WHC) by the Department of Energy (DOE). Id. at 1085. WHC sent the employees of the various companies booklets stating that it would create a new pension plan and would use a particular formula to calculate each participant's length of service. Id. After the individuals accepted employment with the consolidated company, the company finalized the plans for the new pension program using a different formula for calculating years of service. Id. at 1086. The employees filed suit alleging that the promises contained in the booklets created an informal plan under Donovan. Id.
 
 
 20
 The Ninth Circuit found that the employees had not established the existence of an informal plan under the Donovan analysis because Donovan and its progeny only apply when the surrounding circumstances demonstrate the creation of a de facto pension plan. Id. WHC, in contrast, actually adopted the plan that was discussed in the booklets, albeit with different terms than originally anticipated. The booklets sent to employees prior to the adoption of the formal plan merely "apprise[d] anxious employees of what they might expect once the transition from several employers to WHC was completed. WHC had not completed its negotiations with DOE, and consequently, had not adopted" the plan in the booklets. Id. at 1087. The court also noted that the intent to create a plan is not enough to create liability on the part of the employer:
 
 
 21
 WHC should have explained in its communications that the plan was not formalized and was subject to DOE approval. Failure to do so, however, did not elevate the newsletters and the preliminary summary booklet to the level of an informal plan in June, 1987. The plan simply was not a reality until that December when it was formally adopted.
 
 
 22
 Id.
 
 
 23
 The same analysis applies in this case. Trogdon sent the letters in question in an attempt to keep Cone Mills's employees apprised of the proposed developments in their pension plans. Furthermore, unlike WHC, Cone Mills specifically informed their employees that these plans were subject to change. In this context, Cone Mills's December 12th and 15th letters were merely preliminary statements of its intentions regarding the plan and do not constitute an enforceable plan. See id. Therefore, because the letters were neither a part of the 1983 ESOP nor created an enforceable informal employee benefit plan, we reverse the district court's conclusion that Defendants had a fiduciary duty to abide by them.
 
 
 24
 The fiduciary duty under 29 U.S.C.A. Sec. 1104(a)(1) to "discharge duties with respect to a plan solely in the interest of the participants and beneficiaries" only applies to actions taken by a plan fiduciary in accordance with his duty to administer the employee benefit plan; it does not apply to actions taken by an employer in creating the plan. See Belade v. ITT Corp., 909 F.2d 736, 738 (2d Cir.1990) (design of employee benefit plan is strictly a business decision and does not give rise to any fiduciary duties under ERISA); Dzinglski v. Weirton Steel Corp., 875 F.2d 1075, 1078 (4th Cir.) (" 'Congress left employers much discretion in designing their plans' under ERISA and in determining the level and conditions of benefits.") (quoting Hlinka v. Bethlehem Steel Corp., 863 F.2d 279, 283 (3d Cir.1988)), cert. denied, 493 U.S. 919, 110 S.Ct. 281, 107 L.Ed.2d 261 (1989). Cone Mills's actions with regard to announcing the proposed pension surplus reversion and deciding not to adopt that proposal are left to its sound business discretion and are not subject to the fiduciary duties imposed on plan administrators. At the time the statements were made, the 1983 ESOP was not yet in existence. See Dzinglski, 875 F.2d at 1079-80 (an employer acting as a plan administrator has two roles--employer and plan administrator--but is only a fiduciary with respect to its actions as plan administrator). To hold otherwise would impose liability on Defendants for breach of fiduciary duties with respect to the 1983 ESOP when there was no plan and they were not plan fiduciaries. Accordingly, we reverse the district court's judgment that the representations in the December letters were part of the 1983 ESOP, and that by failing to carry out these representations, Cone Mills breached its fiduciary duties under ERISA.[8]
 
 III.
 
 25
 With regard to the district court's alternative avenue of recovery for Plaintiffs based on incorporation of principles of equitable estoppel into the federal common law of ERISA, the district court is affirmed by an equally divided vote. Therefore, the case is remanded to the district court to examine whether the Plaintiffs can establish reliance creating estoppel of Cone Mills. Because the district court opinion is affirmed on this theory, we need not reach the third-party beneficiary claim. Separate opinions by Judges Murnaghan, Wilkins, and Niemeyer regarding this issue follow.
 
 IV.
 
 26
 We also affirm the district court's rulings in favor of Defendants that ERISA preempts Plaintiffs' state law contract and tort claims against Cone Mills, that the stock contributed to the 1983 ESOP was not overvalued, that Cone Mills was not liable for any delay in appointing a plan fiduciary, and that Cone Mills did not make an enforceable promise to maintain a certain level of pension benefits.
 
 A. Preemption
 
 27
 ERISA specifically provides that it preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C.A. Sec. 1144(a). In interpreting Sec. 1144(a), the Supreme Court has held that ERISA's preemption provision is to be construed broadly, such that a law "relates to" an employee benefit plan "if it has a connection with or reference to such a plan." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97, 103 S.Ct. 2890, 2899-2900, 77 L.Ed.2d 490 (1983).
 
 
 28
 Plaintiffs asserted state law claims for breach of contract, fraud, unjust enrichment, breach of fiduciary duty, negligence, accounting, and conspiracy in an attempt to enforce representations made in connection with the 1983 ESOP, which is undeniably an ERISA-covered employee benefit plan. Because all of these claims clearly "relate to" an ERISA-covered plan, we affirm the district court's conclusion that these state law causes of action are preempted.B. Stock Valuation
 
 
 29
 Plaintiffs also contend that the stock contributed to the 1983 ESOP on April 2, 1984, was overvalued, creating a deficiency in the 1983 ESOP accounts which Cone Mills is required to rectify. Specifically, Plaintiffs claim that the stock is not worth the $100 per share reported by the appraisal firm hired by Cone Mills. Plaintiffs also contend that the district court erroneously shifted to them the burden of proving that the stock was overvalued.
 
 
 30
 Plaintiffs initially contended that it was a prohibited transaction for the ESOP plan fiduciary to acquire the employer's security unless it proved that it received adequate consideration under ERISA Secs. 406(a)(1)(E) and 408(e), 29 U.S.C. Secs. 1106(a)(1)(E) and Sec. 1108(e) (1988). As we stated in the initial panel opinion, the rule cited by Plaintiffs does not apply in this case where the employer's security is acquired by an eligible individual account plan such as 1983 ESOP. 29 U.S.C. Sec. 1107(d)(3)(A) (1988). In their reply brief before this court, Plaintiffs asserted for the first time that Cone Mills's actions violated ERISA Sec. 406(a)(1)(A), prohibiting transactions involving a sale or exchange of property.
 
 
 31
 Plaintiffs and the Secretary of Labor correctly point out that in order to avoid liability for a prohibited transaction under Sec. 406, Cone Mills bears the burden of proving the transaction was for adequate consideration in compliance with Sec. 408(e). Nevertheless, as an initial matter, we reiterate our view that Plaintiffs' acknowledgement of their burden of proof on this issue during trial waived their challenge to its allocation on appeal. Even if this were not so, there is no evidence that the district court's findings that "defendants acted reasonably and prudently in the selection and retention" of an appraiser and "were justified in relying on [the] appraisal of the junior preferred stock" were clearly erroneous. (J.A. at 359, 361.) Moreover, Plaintiffs failed to present any evidence that the stock was in fact worth less than the $100 for which it was appraised and failed to prove that they suffered a loss. As distinguished from the facts in Reich v. Valley Nat'l Bank, 837 F.Supp. 1259 (S.D.N.Y.1993), relied on by Plaintiffs and the Secretary of Labor, Cone Mills's junior preferred stock has held its value, it has been "put" for at least $100 per share each time an employee has retired, and Cone Mills has never missed a dividend payment.
 
 
 32
 C. Promise of Greater Benefits under Post-LBO Plans
 
 
 33
 Plaintiffs also argue that Defendants should be liable under ERISA because the benefits provided under the 1983 ESOP were not greater than the benefits they would have received if the pre-LBO benefit plans had remained in effect after the LBO. Plaintiffs base this claim on the December 12th and March 15th letters, video presentations, and a question-and-answer booklet which promised Plaintiffs that they could not lose any of their pre-LBO benefits under the post-LBO plans, and that they would most likely receive even greater benefits because of the profit sharing potential of the 1983 ESOP. As the district court correctly noted, these statements were not included in the 1983 ESOP plan documents. Therefore, under the analysis employed in section II of this opinion, Plaintiffs are not entitled to recover for any failure to abide by these alleged commitments.
 
 D. Delay in Appointment of a Trustee
 
 34
 Finally, Plaintiffs contend that the district court erred in dismissing their cause of action for breach of fiduciary duty based on Cone Mills' failure to appoint a trustee for the 1983 ESOP upon the creation of the plan in December 1983. The district court reasoned that even if Plaintiffs could bring a cause of action on this basis, they suffered no damage as a result of the delayed appointment. We agree.
 
 
 35
 ERISA requires an employer to appoint a plan fiduciary or trustee. 29 U.S.C. Sec. 1102(a)(1) (1988) (the benefit plan "shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan."). In this case, Plaintiffs allege that Cone Mills breached its fiduciary duty by failing to appoint a trustee for the 1983 ESOP in December 1983, when the Board of Directors adopted a Detailed Plan Description, and by failing to appoint a trustee until Baynes assumed that role on April 2, 1984.
 
 
 36
 Plaintiffs' analysis is flawed for two reasons. First, there was no delay in appointing a plan fiduciary. Cone Mills did not adopt the 1983 ESOP in December 1983. At that time, Cone Mills had not finalized all of the plans for the 1983 ESOP and had only adopted a plan description, which contained terms that were materially different from the terms of the 1983 ESOP plan documents. It was not until April 2, 1984, that Cone Mills formally adopted the 1983 ESOP, which was the same day Cone Mills appointed Baynes as the plan fiduciary. Second, even if the plan had been adopted in December 1983, Cone Mills did not make any contributions to the 1983 ESOP at that time. Until April, there was no corpus of the 1983 ESOP trust for a fiduciary to manage or administer. Therefore, we question, as the district court did, whether Plaintiffs could have suffered any damage by Cone Mills's failure to appoint a plan fiduciary or trustee immediately. The district court correctly ruled for Cone Mills on this claim.
 
 V.
 
 37
 For the reasons discussed above, we affirm the district court's determinations in favor of Defendants on the value of the contributed stock, the preemption issue, the promise to maintain pre-LBO benefits, and the claim for delay in appointing a plan fiduciary. We reverse the district court's determination that the representation regarding the pension reversion surplus was part of the 1983 ESOP or an informal ERISA plan. We affirm by an equally divided court the district court's alternative holding that Plaintiffs are entitled to recover based on incorporation of equitable estoppel principles into the federal common law of ERISA.
 
 
 38
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 MURNAGHAN, Circuit Judge, concurring:
 
 39
 An evenly divided court has affirmed the district court on its finding that the plaintiffs' right to have a transfer of the surplus of the 1983 ESOP depends on proof of reliance. The case has been remanded for decision on that point. We have also affirmed on all other points raised in the appeal concerning which the opinion of Judge Williams states the opinion of the court.
 
 
 40
 I agree with the opinion remanding for decision of the question of whether there was sufficient reliance by the plaintiffs. At the same time, I contend that there also is presented the corollary question of whether a contract might exist under which Cone Mills Corporation was required to adhere to the promise of the surplus under its December 15, 1983 letter to salaried employees. It is to that question that the bulk of this concurrence is devoted.
 
 
 41
 Cone Mills, a large textile manufacturer, faced a hostile takeover bid announced on October 31, 1983. A group of senior management employees decided to mount a leveraged buy-out (LBO). With the objective of encouraging Cone Mills employees to support a favorable vote by the shareholders at the LBO vote on March 26, 1984, the Cone Mill's management corresponded with the company's employees. Specifically, in an effort to achieve such an objective, Dewey Trogdon, the Cone Mills President, wrote a letter to salaried employees on December 15, 1983, in which he said:
 
 
 42
 Keep in mind that Cone Mills has very limited value to anyone unless they have the people.... Remember, outside investment organizations do not know how to run a textile and foam business. They need you!
 
 
 43
 By deposition in the ensuing litigation, Trogdon, speaking of the period while the LBO was generally known and the senior management's contesting of the hostile takeover through the LBO was soon to be voted on testified:
 
 
 44
 It's important all the time to cultivate the loyalty of the employees, and I would say it's especially important at a time when they are distracted. A hostile takeover attempt is one of those.
 
 
 45
 In his letter of December 15, 1983, written in his "official capacity as chairman of the board," Trogdon also said:
 
 
 46
 If the management and bank proposal to buy the Company is successful, there is an agreement among the management and the banks that we will contribute the surplus, or its equivalent in Company stock, to the ESOP. When the transaction is executed and the contribution is made, you, I, and all other Cone employees will "take title" to a substantial asset in which we currently have no rights or ownership.
 
 
 47
 The surplus to which Trogdon referred had been developed by pension plans for Cone Mills employees and, under the Cone Mills plans if the LBO were to be successful, which in time it was, would change title from those pension plans of Cone Mills to a 1983 ESOP pension plan to be created for the benefit of the employees. Unless and until the December 15, 1983 letter should become effective, the surplus to which Trogdon referred was the excess of the amount needed to purchase annuities and would be entitled to retention by Cone Mills.
 
 
 48
 At the time of the December 15, 1983 letter, Trogdon and other senior management personnel assumed that the surplus was over $50,000,000.[1] However, by the time the surplus was distributed on dates through December 23, 1985, it had grown to $69,000,000.[2] The LBO had, on March 26, 1984, achieved a favorable result[3] so "the management and bank proposal to buy the company [was] successful." Consequently, "all of the Cone employees" became entitled to the surplus which was "a substantial asset" theretofore not owned by the employees.
 
 
 49
 The most simple and straightforward meaning of "surplus" is what the word unambiguously signifies. A surplus could and almost surely would fluctuate in value (probably upward) over time. No time for calculation of value is specifically called for in the December 15, 1983 letter; consequently the surplus should be valued when it had a determined value, i.e., when it was terminated and so for the first and only time became fixed.
 
 
 50
 But even if a precise value of $50,000,000 is accepted at some earlier date, the date of that valuation was the date of the December 15, 1983 letter or March 26, 1984 when the LBO was successful and created the occasion for contributing the surplus to the 1983 ESOP. Thereupon title to the surplus, as the December 15, 1983 letter stated unambiguously, would have passed to the 1983 ESOP. As title holder or owner, the 1983 ESOP was automatically the one to receive any increase in value accruing after the contribution. If the contribution took place on March 26, 1984 upon the successful election approving the LBO, perhaps the correct amount of the surplus' value was $50,000,000, but that date would be substantially sooner than December 23, 1985 when the value of the surplus was finally fixed. The "surplus" referred to all of the surplus on the date of distribution.
 
 
 51
 So whichever valuation was intended in the December 15, 1983 letter, $50,000,000 calculated as of March 26, 1984 or $69,000,000 as of December 23, 1985, the result is the same since the 1983 ESOP was the owner entitled to all increase between the two dates. That conclusion is consistent with president Trogdon's testimony that there was a "binding" obligation or "agreement."[4]
 
 
 52
 So, with respect to at least a valuation of $50,000,000 Trogdon believed the conveyance of "the surplus" was a binding obligation. Also, the successful senior management caused Cone Mills, through several contributions to the 1983 ESOP, to make contributions totalling $54,796,638. So Trogdon apparently accepted and performed the December 15, 1983 letter as a "binding obligation," i.e., contract. The legal question of whether Cone Mills made a binding promise should properly be considered settled. In addition, the district judge has made a finding of fact as to the applicable value of the surplus which was not clearly erroneous, Elmore v. Cone Mills, No: 6:88-3258-17, order at 26-27 (D.S.C. Sept. 18, 1991) (Findings of Fact, Conclusions of Law, and Order), that the "surplus" in the December 15, 1983 letter was $69,000,000 when the surplus was terminated. That finding should be accepted.
 
 
 53
 If the Trogdon "binding obligation" is excused or ignored, there will still remain the simple basic question of whether contract law has indeed been satisfied. The Cone Mills' December 15, 1983 letter provided the promise, but what consideration then makes it binding?
 
 
 54
 The district judge left open for subsequent determination the question of reliance if the existence of a contract or its equivalent was established on an estoppel basis. While the district court spoke in terms of equitable estoppel, it is clear that what is at issue in the instant case is the making--and subsequent breaking--of a promise. Strictly speaking, then, the matter is one appropriately considered under the equitable doctrine of promissory estoppel.[5] Promissory estoppel, where reliance is shown, has the significance of consideration. See Allen M. Campbell Co., General Contractors, Inc. v. Virginia Metal Indus., Inc., 708 F.2d 930, 931 (4th Cir.1983) ("[P]romissory estoppel ... allows recovery even in the absence of consideration where reliance and change of position to the detriment of the promisee make it unconscionable not to enforce the promise."); Restatement (Second) of Contracts Sec. 90(1) ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action is binding if injustice can be avoided only by enforcement of the promise."); 4 Richard A. Lord, Williston on Contracts Sec. 8:5 (4th ed. 1992).
 
 
 55
 I have voted to affirm the district judge's decision which took the estoppel approach. He concluded that recovery by the plaintiffs could be possible either under estoppel or third party beneficiary theories. In either case, reliance must be shown. I do not believe, however, that estoppel is the only route with which to find Cone Mills' promise binding. The senior management group appears to have made the December 15, 1983 promise hoping that the Cone Mills employees would support and vote for the LBO. It is evident that the employees did. Their doing so would create the contractual support for a unilateral contract. Restatement (Second) of Contracts Sec. 30(1) ("An offer may invite or require acceptance to be made by an affirmative answer in words, or by performing or refraining from performing a specified act ...."); 1 Lord, Williston on Contracts Sec. 1:17 (discussing the difference between unilateral and bilateral contracts) (emphasis added). The district judge, on remand, should be free to investigate that question.
 
 
 56
 The question also has arisen of what effect the presence of ERISA has, if any, on the instant case. However, the binding obligation, that is a contract, was entered and all conditions thereof met by the LBO's adoption on March 26, 1984, well before adoption on April 2, 1984 of the Plan incorporating the 1983 ESOP. Prior existence of the Plan when the contract was formed might have caused problems to arise. In Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 60 (4th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 1051, 122 L.Ed.2d 359 (1993), we held that estoppel principles cannot be used to effect a modification of an existing ERISA benefit plan. In such a case, adoption of an estoppel theory
 
 
 57
 would require this court to rewrite the contract of insurance. While a court should be hesitant to depart from the written terms of a contract under any circumstances, it is particularly inappropriate in a case involving ERISA, which places great emphasis upon adherence to the written provisions in an employee benefit plan. Plaintiff's theories, though packaged in different wrappers, all would lead to the same result--the written plan would no longer be the benchmark in an action under ERISA.
 
 
 58
 Id. at 56. Similarly, in Singer v. Black & Decker Corp., 964 F.2d 1449, 1452 (4th Cir.1992), we held that "resort to federal common law generally is inappropriate when its application would conflict with the statutory provisions of ERISA, discourage employers from implementing plans governed by ERISA, or threaten to override the explicit terms of an established ERISA benefit plan." This is so because
 
 
 59
 ERISA demands adherence to the written terms of an employee benefit plan.... Federal common law does not provide a backdoor through which these statutory requirements may be evaded, and attempts to import state common law principles such as equitable or promissory estoppel to alter and undermine written obligations have been consistently rebuffed by the courts.
 
 
 60
 Id. at 1453-54 (Wilkinson, J., concurring).
 
 
 61
 I have no quarrel with any of these prior decisions in their proper context. However, here the Plan was created subsequent to the contract, so no such Plan existed when the contract came into existence. Hence, no comparison of the two was possible.[6] The contract when made could not threaten the integrity of the written plan. Moreover, the contract in no way departed from Cone Mills' intention to create a binding obligation. Only the determination of the date as of which the surplus should be valued was in issue. I have attempted to demonstrate that the result is that same whichever date is used to value the surplus: $69,000,000 less $54,796,638. We have recently recognized that, in enacting ERISA, Congress "intended that the courts would develop a federal common law of rights and obligations under ERISA-regulated plans." Id. at 1452 (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)) (quotations and internal citations omitted); see also Holland v. Burlington Indus. Inc., 772 F.2d 1140, 1147 n. 5 (4th Cir.1985) (Congress intended for courts to borrow from state law when appropriate in fashioning federal common law to govern ERISA), aff'd sub nom. Brooks v. Burlington Indus. Inc., 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 559 and cert. denied sub nom. Slack v. Burlington Indus. Inc., 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986). In Singer, we acknowledged the difficulty courts may encounter in delineating the situations where federal common law would be a "desirable companion to ERISA," from those where it would unduly expand rights and remedies established by the statutory scheme. But we also admonished the district court for "paint[ing] with too broad a brush in stating categorically that courts should not look to state common-law causes of action that have been preempted by ERISA in fashioning federal common law." Singer, 964 F.2d at 1452. Indeed, the Singer court defended the use by a federal court of common law doctrines "to assist in shaping the federal common law of ERISA," by noting that use of common law doctrines "to further[ ] the goals of ERISA" would advance, not frustrate, the intention of Congress that ERISA subject plans and plan sponsors to a uniform body of benefits law. Id. at 1452-53. I would submit that the instant case cries out for the application of federal common law, precisely in order to effectuate ERISA's promise, namely to protect the expectations of those who are beneficiaries of the Plan.[7]
 
 
 62
 Moreover, an extension of the primacy of the Plan, when it is later adopted, to a preexisting contract would render the contract, the "binding obligation," changeable, i.e., non-binding. I see no evidence that Congress intended, with the enactment of ERISA, to make any contract always unenforceable, that is always capable of being changed or made unenforceable by one of the parties. In the instant case, that party is the employer, the one who would adopt not only the Plan but also any amendment thereto. ERISA should not be understood as rendering illusory all such commitments made by employers. See 1 Lord, Williston on Contracts Sec. 1:2 ("[A]n apparent promise which makes performance optional with the promisor ... is in fact no promise.... Such an expression is often called an illusory promise.") While an employee endorsed post-Plan amendment could well represent a provision actually inconsistent with the prior intent of the maker of the Plan, as in Coleman or Singer, here, on the contrary, the December 15, 1983 letter written by Cone Mills' president and ratified by the entire Board of Directors on May 15, 1984 contained the promise upon which the plaintiffs relied. It clearly represented the employer's view. Moreover, since the Plan contains both a provision for mandatory and a provision for discretionary contributions to the ESOP, nothing in the Plan is inconsistent with the intent expressed by the employer in making its promise.
 
 
 63
 In summary, the overall objective of ERISA is to insure fair treatment of employees, see, e.g., Donovan v. Dillingham, 688 F.2d 1367, 1372 (11th Cir.1982); Coleman, 969 F.2d at 60; Cleary v. Graphic Communications Int'l Union, 841 F.2d 444, 447 n. 5 (1st. Cir.1988); Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 157, 105 S.Ct. 3085, 3098, 87 L.Ed.2d 96 (1985) (Brennan, J., concurring), and, to achieve that result, the employees should be accorded what they were promised, namely, the surplus determined when it terminated on December 23, 1985, i.e., $69,000,000--$54,796,638, that is $14,203,362. Whether the date of termination or the date of the earlier transfer of title to the surplus was meant, the result is the same.
 
 
 64
 Nothing in the ERISA law should permit a result whereby one party can unilaterally change a Plan later adopted and thereby impair an already existing contract. Allowing an employer to invalidate a binding contract made while the 1983 ESOP Plan was in gestation would permit one party to alter a contract unilaterally, against the other contracting party's will, to change "Yes" to "No."
 
 
 65
 Judge K.K. HALL, Judge MICHAEL, Judges, and Senior Judge SPROUSE have authorized me to say that they concur in my concurring opinion.
 
 WILKINS, Circuit Judge, concurring:
 
 66
 I agree with the positions set forth in the opinion of Judge Williams issued for the en banc court. I write separately to express my belief that it is unnecessary for us to decide whether federal common-law theories as a companion to ERISA are applicable under the circumstances presented here. In my view, even if we were to hold that application of such theories is appropriate, Plaintiffs could not recover because on the undisputed facts they cannot demonstrate that they expected to receive contributions of more of the surplus than Cone Mills actually contributed. Consequently, I would enter judgment in favor of Cone Mills on this basis and reserve judgment on the difficult question of the appropriateness of fashioning common-law theories under ERISA.I.
 
 
 67
 In response to the concerns of Cone Mills' employees regarding the proposed LBO by management, Cone Mills' President and Chairman of the Board, Dewey Trogdon, issued various communications to the employees during the months preceding the LBO. Examination of these communications reveals that in all of the information provided to Cone Mills' employees concerning the amount of the proposed pension reversion surplus it was estimated that the surplus was approximately $50 million and this amount would be contributed over the first two plan years.
 
 
 68
 The first of the communications at issue is a letter dated December 12, 1983 from Trogdon to all employees. The letter explains that Cone Mills' board had approved the plan for management to purchase Cone Mills' stock and had approved the adoption of the 1983 ESOP. The letter states in pertinent part, "Currently, it is difficult for me to give details, but subject to legal and tax rulings, it appears that in the first two years (1984-85), over fifty million dollars of stock could be contributed to your ESOP."
 
 
 69
 The next communication with employees was a "Personal Letter to our Salaried Employees" authored by Trogdon on December 15, 1983 and mailed to all of Cone Mills' salaried employees. Discussing the surplus, the letter provides in pertinent part:
 
 
 70
 If the management and bank proposal to buy the Company is successful, there is agreement among management and the banks that we will contribute the surplus, or its equivalent in Company stock, to the ESOP. When the transaction is executed and the contribution is made, you, I, and all other Cone employees will "take title" to a substantial asset in which we currently have no rights or ownership.
 
 
 71
 The December issue of The Textorian, Cone Mills' company newspaper, presented highlights of the 1983 ESOP. It stated, "Over $50 million of stock could be contributed the first two years of the plan, if the plan is approved by the federal government."
 
 
 72
 A videotaped communication viewed by Cone Mills' employees in February 1984, informed employees:
 
 
 73
 [A] key part of the Cone reorganization will be a new employee stock ownership plan, or ESOP. Under this plan, it is anticipated that Cone will contribute over $50 million in stock to employees for 1983 and 1984....
 
 
 74
 ....
 
 
 75
 Cone expects to contribute over $50 million of company stock to the ESOP for the years 1983 and 1984.
 
 
 76
 A question-and-answer pamphlet distributed to employees following the video presentation stated, "If all goes according to plan, over $50 million of stock will be contributed to the ESOP for the years 1983 and 1984." And, the February 23 proxy statement, sent to salaried employees who participated in Cone Mills' employee stock ownership plan, referred to "an estimated $50 million of surplus funding" in Cone Mills' retirement plans.
 
 
 77
 On March 15, 1984, Trogdon sent a memo to salaried employees in which he addressed specific questions that management had received about the LBO. With respect to the amount of the contributions to the 1983 ESOP for the 1983 and 1984 plan years, Trogdon stated that the "contributions are estimated at $50 million."
 
 
 78
 Following completion of the LBO in March 1984, Cone Mills began to make contributions to the 1983 ESOP. The district court found that Cone Mills contributed stock valued at a total of $54,796,638 to the 1983 ESOP for plan years 1983 and 1984.
 
 II.
 
 79
 Cone Mills argues on appeal that even if this court were to hold that common-law theories should be applied to enable employees to enforce the representations made by Cone Mills, it is nevertheless entitled to judgment because the undisputed facts demonstrate that Plaintiffs could not have relied on contribution of an amount more than the approximately $55 million that Cone Mills actually contributed to the 1983 ESOP for the first two plan years. I find this argument persuasive.
 
 
 80
 It is undisputed that in the months preceding the LBO no one knew the exact amount of the surplus, but everyone believed that the surplus was approximately $50 million. Indeed, the district court observed, "I think everybody thought [the surplus] was $50 million." The district court noted that when Trogdon made the representations concerning the amount of the surplus to be contributed, "management knew that the ultimate amount would depend upon a number of factors, including fluctuating interest rates and annuity costs." The district court stated, "For this reason, in describing the anticipated amount of [the] surplus, [Cone Mills] and the lending banks used such terms as 'approximately $50 million,' 'over $50 million,' or '$50 million or more.' "
 
 
 81
 Each of the representations to Plaintiffs concerning the amount of the surplus to be contributed to the 1983 ESOP used the $50 million estimate with qualifying language. The record is unassailable that Cone Mills and Plaintiffs acted at all times with the mutual understanding that the surplus amounted to approximately $50 million. Because in the only information available to Plaintiffs it was estimated that the amount of the surplus was approximately $50 million, Plaintiffs could not have relied upon receipt of a substantially greater amount.
 
 
 82
 Plaintiffs' argument that they relied on the promise contained in Trogdon's letter of December 15, which mentioned only the surplus without reference to any amount, lacks merit. Clearly, the estimated $50 million potential contribution, not a general reference to "the surplus," was the single factor of importance to Plaintiffs. For example, if Cone Mills had promised to contribute the surplus, which it had estimated to be about $100, the promise of the surplus would have been insufficient to potentially influence Plaintiffs' actions. Accordingly, in my view, the only reasonable construction of the undisputed evidence is that the estimated amount of the surplus was integral in inducing any possible reliance by Plaintiffs.*
 
 
 83
 Finally, the argument is made that even if Plaintiffs only relied on the $50 million estimated amount of the surplus, they are nevertheless entitled to the remainder of the surplus. This is so, the argument proceeds, because Plaintiffs were entitled to the surplus on the day the LBO was completed and were therefore entitled to any interest that accrued on the surplus after that date. In my view, this argument also lacks merit. None of the communications by Cone Mills to the employees represented that the surplus would be contributed to the 1983 ESOP on the day the LBO was completed. To the contrary, all of the representations concerning the time frame for contribution of the surplus indicated that the surplus would be contributed for the first two plan years (e.g., "in the first two years (1984-85)"; "the first two years of the plan"; "for the years 1983 and 1984"; "I urge you to take a look at how much stock is being put into the ESOP for 1983 and how much is planned for 1984") and that Cone Mills' employees would receive title to the surplus when the contribution was made. Accordingly, Plaintiffs could not have relied on receiving the surplus on the day the LBO was completed.
 
 III.
 
 84
 In conclusion, Cone Mills contributed approximately $55 million to the 1983 ESOP for the first two plan years. It thus fulfilled any obligation it may have created by its representations to its employees. Permitting Plaintiffs to recover the remaining portion of the surplus, in my view, would result in an unjustified and unanticipated windfall.
 
 
 85
 Judge NIEMEYER and Judge WILLIAMS have advised that they join in this opinion.
 
 
 86
 NIEMEYER, Circuit Judge, concurring in part and dissenting in part:
 
 
 87
 The court's opinion, in which I concur, concludes that the letters of December 13 and 15, 1983, do not constitute a "plan" regulated by ERISA and that therefore the plaintiffs cannot make a claim for plan benefits based on those letters. By an equally divided vote, however, the court has left open the plaintiffs' claim for $14 million based on an equitable estoppel theory. As an alternative basis to justify plaintiffs' claim, the district court fashioned federal common law under ERISA, giving plaintiffs a claim based on equitable estoppel. The court indicated that if the theory were upheld on appeal, it still had to take evidence and make findings on the existence of any reliance on the part of the plaintiffs. By our equally divided vote, we have left standing the district court's theory and now must remand to permit the district court to pursue that course. Because the equitable estoppel claim formulated by the district court is not justified by its own findings and because ERISA does not authorize any other causes of action to award the plaintiffs $14 million, I would reverse. Accordingly, I dissent from our affirmance of the district court on this issue.
 
 
 88
 * In connection with a campaign by Cone Mills' management to persuade stockholders and employees that a leveraged buy-out by management would be more desirable to stockholders and employees than a hostile takeover by Western Pacific Industries, management published to employees several communications during the period between November 1983 and March 1984. Management stated in these letters that it opposed the hostile takeover effort and advised the employees what management was prepared to do if a leveraged buyout were approved. One of the proposals involved the current pension plan, about which management advised the employees that not only would existing pension benefits be preserved, but surplus monies due to past overfunding of the pension plan, estimated at the time to be about $50 million, would be invested in a to-be-formed employee stock ownership plan (an "ESOP"). In a letter dated December 12, 1983, management explained:
 
 
 89
 Currently, it is difficult for me to give details, but subject to legal and tax rulings, it appears that in the first two years (1984-85), over fifty million dollars of stock could be contributed to your ESOP. At this point I am not allowed to legally guarantee that amount, nor will it be the same amount in future years. However, the estimated contribution does give you a good indication that our ESOP will become a very large stockholder of Cone Mills.
 
 
 90
 Speaking more specifically, in a letter dated December 15, 1983, management said:
 
 
 91
 The third factor for discussion involves disposition of surplus funds in the [pension] Plan due to over-funding by the Company for a period of years. These surplus funds belong to the Company (the current stockholders), or anyone else who would purchase the Company or its stock. You and I as employees are entitled to certain guaranteed benefits from the Plan in accordance with established Plan formulas. We have no title to surplus funds contributed by the Company beyond what it takes to fund our pension benefits.
 
 
 92
 If the management and bank proposal to buy the Company is successful, there is agreement among management and the banks that we will contribute the surplus, or its equivalent in Company stock, to the ESOP. When the transaction is executed and the contribution is made, you, I, and all other Cone employees will "take title" to a substantial asset in which we currently have no rights or ownership.
 
 
 93
 Neither the data nor the precise mechanisms for accomplishing the expressed intention of management were finalized at the time these letters were written. These plans of management were discussed in further detail in subsequent bulletin board notices and video presentations to the employees. By late December 1983 and early 1984, however, the discussion had moved from the estimated $50 million surplus to a contribution based on 10% of the participant's pay for each of the years 1983 and 1984, and 1% for the year thereafter, the so-called 10%/10%/1% formula. Under this formula, it was still estimated that the ESOP contribution would be over $50 million.
 
 
 94
 In late February or early March of 1984, Cone Mills circulated a proxy statement to stockholders (including employees who were stockholders) in which it finally advised that the ESOP would be funded on the basis of the 10%/10%/1% formula set forth in the ESOP plan documents, stating that "the actual contribution [to the ESOP] will be determined by the Board of Directors of Cone."
 
 
 95
 Thereafter, the leveraged buy-out was successfully completed and Cone Mills contributed $54,796,638 over a period of two years to the ESOP in accordance with the 10%/10%/1% formula contained in the plan's terms. During the period of its contributions, however, the surplus in Cone Mill's pension plan had increased to $69 million. This $69 million surplus exceeded the contribution made under the formula, which was $54,796,638, and Cone Mills retained the additional $14,203,362, the sum for which the plaintiffs are now suing. The plaintiffs allege that they are entitled not to a $50-million-surplus fund or to a 10%/10%/1% contribution, but rather to "the surplus" in whatever amount that might be. To make that claim, they rely largely on the December 15 letter which states that if the leveraged buy-out arrangement is successful, Cone Mills "will contribute the surplus, or its equivalent in Company stock, to the ESOP."
 
 
 96
 The district court found that this statement constituted a promise that Cone Mills would contribute the pension surplus, in whatever amount, into the ESOP and that this promise was part of the ESOP plan, even though such a promise was not incorporated into the subsequently adopted written plan. The court also found that Cone Mills was equitably estopped from denying the promise, providing an alternative basis for awarding plaintiffs the $14 million surplus. Since this court's opinion has already addressed the question of whether the December letters constituted a plan, I address only the equitable estoppel issue.
 
 II
 
 97
 As the district court properly noted in its opinion, this circuit has yet to address whether federal common law under ERISA should extend to include an equitable estoppel claim. We have, however, held previously that using estoppel principles to modify a written plan's terms would conflict with ERISA's preference for written agreements. In Coleman v. Nationwide Life Ins. Co., 969 F.2d 54 (4th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 1051, 122 L.Ed.2d 359 (1992), we held:
 
 
 98
 [A]ny modification to a plan must be implemented in conformity with the formal amendment procedures and must be in writing.... Equitable estoppel principles, whether denominated as state or federal common law, have not been permitted to vary the written terms of a plan.
 
 
 99
 Id. at 58-59 (Wilkinson, J.). Likewise, in Singer v. Black & Decker Corp., 964 F.2d 1449 (4th Cir.1992), we held,
 
 
 100
 resort to federal common law generally is inappropriate when its application would conflict with the statutory provisions of ERISA, discourage employers from implementing plans governed by ERISA, or threaten to override the explicit terms of an established ERISA benefit plan.
 
 
 101
 Id. at 1452. In a concurring opinion in Singer, Judge Wilkinson commented that "attempts to import state common law principles such as equitable or promissory estoppel to alter and undermine written obligations have been consistently rebuffed by the courts." Id. at 1454, citing Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1165 n. 10 (3d Cir.1990); Pizlo v. Bethlehem Steel Corp., 884 F.2d 116, 120 (4th Cir.1989).
 
 
 102
 The rationale for these principles rests on the need to protect plans from undefined liabilities and consequently to protect the plan's participants and their beneficiaries. See 29 U.S.C. Sec. 1001(b). To allow informal or oral modifications of plans under some theory of common law would undermine the protection afforded by ERISA because "employees would be unable to rely on these plans if their expected retirement benefits could be radically affected by funds dispersed to other employees pursuant to" side agreements. Miller v. Coastal Corp., 978 F.2d 622, 625 (10th Cir.1992) (internal citation omitted). Moreover, if employer obligations could be so casually created outside the written plan, "a substantial disincentive to offering such plans would arise since employers would be potentially exposed to massive future liabilities for which they could not confidently plan." Singer, 964 F.2d at 1454 (Wilkinson, J., concurring). Finally, "allowing informal modifications would invite costly, litigious evidentiary disputes over what 'promises' or 'representations' were or were not made," id., which is precisely the situation before us on this appeal.
 
 
 103
 Where fraud and misrepresentations by employers are involved, however, courts in other circuits have extended federal common law to include limited equitable estoppel principles, and the district court in this case relied on such opinions in allowing the plaintiffs an equitable estoppel claim based on the December 15 letter sent by Cone Mills. The district court relied principally on Lockrey v. Leavitt Tube Employees' Profit Sharing Plan, 748 F.Supp. 662 (N.D.Ill.1990), and Lipscomb v. Transac, Inc., 749 F.Supp. 1128 (M.D.Ga.1990), to allow an equitable estoppel claim. In each of these cases, however, the court enforced pre-plan statements which constituted misrepresentations about the benefits of the plan. In Lipscomb, the court said:
 
 
 104
 While an employer may rely upon a written plan to protect itself from oral modifications and amendment, its agent may not, before producing a written plan, make false representations to employees with regard to coverage, and only after a claim is filed or a relevant event occurs rely upon a later-composed, conveniently inconsistent version of the "plan" to deny benefits to employees.
 
 
 105
 749 F.Supp. at 1135. Similarly, the court in Lockrey stated:
 
 
 106
 Defendants fail to recognize that the alleged statements went beyond a mere description of the plan as it existed, and included representations to plaintiff as to how his benefits would, in the future, be computed if he took certain actions.
 
 
 107
 748 F.Supp. at 667. The court in Lockrey relied on the Seventh Circuit decision in Black v. TIC Invest. Corp., 900 F.2d 112, 115 (7th Cir.1990), where the court held that "[a]n estoppel arises when one party has made a misleading representation to another party and the other has reasonably relied to his detriment on that representation." (Emphasis added). The court explained:
 
 
 108
 The reasons for the general application of estoppel are simple enough--the doctrine prevents a party from benefitting from its own misrepresentations.... There is no good reason to breach the general rule that misrepresentations can give rise to an estoppel. There is no reason for the employee who reasonably relied to his detriment on his employer's false representations to suffer. There is no reason for the employer who misled its employee to be allowed to profit from the misrepresentation.
 
 
 109
 Id. (emphasis added).
 
 
 110
 In like manner, courts have imposed fiduciary duties on employers under 29 U.S.C. Sec. 1109 for eve-of-plan misrepresentations even though, technically speaking, no fiduciary duty arises until a plan is in place. In all of these cases where the duty was imposed, however, factual misrepresentations were made by the employer. See Berlin v. Michigan Bell Telephone Co., 858 F.2d 1154, 1164 (6th Cir.1988) (once "fiduciary does communicate with potential plan participants after serious consideration has been given [to the plan], then any material misrepresentations may constitute a breach of their fiduciary duties"); Eddy v. Colonial Life Ins. Co., 919 F.2d 747, 750 (D.C.Cir.1990) (citing Berlin with approval and holding that "a fiduciary must convey complete and correct material information to a beneficiary.").
 
 
 111
 As may be discerned, the holdings of these cases emanate from the equitable principle that a company should not benefit from its misrepresentations. What is remarkable in the district court's swift extension of federal common law in this case to include equitable estoppel is the fact that no misrepresentation was found by the district court. What is even more remarkable is that no party has suggested on appeal that the district court's finding was erroneous.
 
 
 112
 No case has been found to hold that, in the absence of factual misrepresentation by fiduciaries, a claim for breach of a contract, collateral to the plan, is granted by ERISA, particularly when the alleged contract conflicts with the written plan. On the contrary, we have twice before rejected such a notion in the context of conflicting promises made after the adoption of a plan. See Coleman, 969 F.2d 54; Singer, 964 F.2d 1449. The fact that a plan was in place in those cases does not distinguish them from the circumstances here, where the plan was produced subsequent to the promise. In each case, the promise and the plan conflicted, and in each case, the plan was held to govern the obligations and benefits, absent extraordinary circumstances such as a fraud or a misrepresentation. Under these circumstances, in my view, it was error for the district court to have relied on federal common law of equitable estoppel, which by definition, requires a misrepresentation as an element. See Black v. TIC Invest., 900 F.2d at 115; Carver v. Westinghouse Hanford Co., 951 F.2d 1083, 1087 (9th Cir.1991) ("In this circuit, estoppel is available against a non-governmental party who has made a knowing false representation, or concealment of material facts.") (internal citation omitted), cert. denied, --- U.S. ----, 112 S.Ct. 3036, 120 L.Ed.2d 905 (1992). For that reason alone, the district court's ruling on equitable estoppel must be reversed.
 
 
 113
 In applying an equitable estoppel theory to this case, the district court also relied on 29 U.S.C. Sec. 1132(a)(3)(B). This provision, however, which authorizes equitable relief, is limited in its applicability. It provides:
 
 
 114
 A civil action may be brought--
 
 
 115
 (3) by a participant ... (B) to obtain other appropriate equitable relief (i) to redress such violations [of this subchapter] or (ii) to enforce any provisions of this subchapter or the terms of the plan.
 
 
 116
 29 U.S.C. Sec. 1132(a)(3)(B) (emphasis added). Thus, the equitable relief which is authorized under this section is limited to (1) redressing or enforcing the provisions of ERISA, or (2) enforcing the terms of a plan.
 
 
 117
 The Supreme Court, interpreting this very provision authorizing "other appropriate equitable relief," stated that the provision "does not, after all, authorize 'appropriate equitable relief' at large, but only 'appropriate equitable relief' for the purpose of 'redress[ing any] violations or ... enforc[ing] any provisions' of ERISA or an ERISA plan." Mertens v. Hewitt Associates, --- U.S. ----, ----, 113 S.Ct. 2063, 2067, 124 L.Ed.2d 161 (1993). There is no claim here that there was a violation of ERISA or that the equitable estoppel theory was required to enforce any terms of the plan. In fact, as this court's opinion notes, the December 15 letter did not constitute a plan or any portion of a plan. Thus, 29 U.S.C. Sec. 1132's "equitable relief" provision could not serve as a basis for affording relief to the plaintiffs in this case. Although Congress intended for courts to develop a "federal common law of rights and obligations under ERISA-regulated plans," Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989), this did not give "carte blanche" authority for the courts to develop claims at large. Thus, in relying on 29 U.S.C. Sec. 1132(a)(3)(B) to provide a basis for creating an equitable estoppel claim, the district court also erred.
 
 III
 
 118
 The concurring opinion of Judge Murnaghan apparently recognizes the difficulties that exist with the district court's theories, since his opinion does not rest on the authorities cited by the district court. Rather, to support the claim based on the December 15 letter, Judge Murnaghan would fashion a common law theory of promissory estoppel, rather than equitable estoppel, to create a new contractual obligation under ERISA. Under this theory, Judge Murnaghan would have the management bear the obligation to fund the ESOP with the "surplus" as described in the single clause of the December 15 letter, regardless of what the executed written plan's terms state. To accomplish this, Judge Murnaghan relies on common law principles of promissory estoppel described in Restatement (Second) of Contracts, Sec. 90(1) ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action is binding if injustice can be avoided only by enforcement of the promise."). See also Allen M. Campbell Co. General Contractors, Inc. v. Virginia Metal Industries, Inc., 708 F.2d 930, 931 (4th Cir.1983) (holding that promissory estoppel will provide a basis for enforcement of a promise even in the absence of consideration).
 
 
 119
 Given the fact that the district court below explicitly relied on the theory of equitable estoppel, rather than promissory estoppel, and the fact that the parties briefed the court solely on the theory of equitable estoppel, the reviewing court should not pass judgment on this additional theory not addressed below. See Singleton v. Wulff, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."); Hormel v. Helvering, 312 U.S. 552, 556, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941) (the general rule is "essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues ... [and] in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence."). Although the Supreme Court has hinted that there may be some exceptional circumstances where a federal appellate court is justified in resolving an issue not passed on below, in cases where injustice would result otherwise, see Singleton, 428 U.S. at 121, 96 S.Ct. at 2877, it is my opinion that this is not such a case.
 
 
 120
 In response to my opinion, Judge Murnaghan has added footnote 5 to his opinion which suggests that either branch of estoppel, equitable or promissory, should be open for consideration by the district court. Indeed, he observes that it is "abundantly clear" that "the district court's concern was actually with promissory estoppel." Judge Murnaghan relies heavily on excerpts from the district court's opinion which characterize the December letters as "promises" to support his thesis that the district court was only relying on the theory of promissory estoppel. Such a conclusion, however, requires a somewhat creative interpretation that is not fully justified by the district court's opinion. First, the excerpts on which Judge Murnaghan relies are mostly from the "Background" portion of the district court's opinion, rather than the "Conclusions of Law" portion. The Background section relates to any one of the many legal issues in the case, ranging from simple state law breach of contract to civil RICO. Indeed, the district court concluded, as its central holding, that the December letter constituted a written promise that formed part of an ERISA plan, a holding that we have today reversed. It is therefore not surprising that the district court used the term "promise." It is, at best, questionable that the use of the term "promise" related to the alternative theory of recovery based on equitable estoppel. It certainly cannot be maintained that there is conclusive evidence that the district court was relying solely on promissory estoppel.
 
 
 121
 Judge Murnaghan also asserts that "it is plain that the district court merely mislabeled the branch of estoppel it considered." This statement is also unsubstantiated by the opinion. In the paragraph immediately preceding the district court's legal conclusion that "all of the other elements of equitable estoppel [except reliance element] are present here," the district court explicitly adopted the following definition of equitable estoppel stated in Black v. TIC Investment Corp., 900 F.2d 112, 115 (7th Cir.1990): "An estoppel arises when one party has made misleading statements to another party and the other has reasonably relied to his detriment on that representation." District Court's Findings of Fact, Conclusions of Law, and Order, C/A No. 6:88-3258-17 (Sept. 18, 1991), at 47-48 (emphasis added). To me, it could not be clearer that the district court relied only on the theory of equitable estoppel and not promissory estoppel (a term never used by the district court), to provide an alternative means of recovery.
 
 
 122
 Judge Murnaghan also argues that because the district court reserved judgment on the reliance element of an estoppel theory, the court must have been referring to promissory estoppel. Judge Murnaghan seems to be suggesting that because reliance is an element of promissory estoppel, the district court could only have been discussing the theory of promissory estoppel in referring to reliance. That conclusion does not follow, however, in view of the fact that reliance is also an element of equitable estoppel. See Black v. TIC Investment Corp., 900 F.2d at 115.
 
 
 123
 Finally, Judge Murnaghan argues that we should not be so formalistic in interpreting the district court's opinion as to preclude the possibility of that court's having relied on promissory estoppel, especially in light of the fact that "courts often conflate the doctrines." However, recognizing that other courts, as well as this Court, suffer from "doctrinal confusion" is no basis for the assertion that such confusion must be extended in this case. Such justification is particularly untenable in an ERISA federal common law case, where the courts must be cautious not to create new causes of action out of whole cloth, in violation of the explicit statutory enforcement scheme which limits the causes of action available under the Act. See Mertens v. Hewitt Assoc., --- U.S. ----, ----, 113 S.Ct. 2063, 2067, 124 L.Ed.2d 161 (1993) (limiting " 'appropriate equitable relief' for the purpose of 'redress[ing any] violations or ... enforc[ing] any provision' of ERISA or an ERISA plan.").
 
 
 124
 Moreover, the extension of ERISA by federal common law to include a promissory estoppel claim has been rejected by other circuit courts that have passed on the issue. See Miller v. Coastal Corp., 978 F.2d at 625 ("we will not import notions of promissory estoppel into ERISA"); Alday v. Container Corp. of America, 906 F.2d 660, 666 (11th Cir.1990) ("the Eleventh Circuit explicitly held that there was no federal common law right to promissory estoppel under ERISA"), cert. denied, 498 U.S. 1026, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991); Williams v. Bridgestone/Firestone, Inc., 954 F.2d 1070, 1072 (5th Cir.1992) (reiterating its prior holding that "claims of promissory estoppel are not cognizable in suits seeking to enforce rights to pension benefits"). And in this case, such claim is unwarranted by the facts which show that at best, any promise that could be relied on was to invest approximately $50 million, as discussed in Part I above and in the separate opinion by Judge Wilkins.
 
 
 125
 In the circumstances of this case, the district court erred in recognizing an equitable estoppel claim without finding a misrepresentation. I would therefore reverse on this issue.
 
 
 126
 Judge LUTTIG and Judge WILLIAMS advise that they join in this separate opinion.
 
 
 
 [1]
 The district court noted its intention to allow Plaintiffs to proceed on these two alternative theories should we determine that Defendants had not breached their fiduciary duties. The district court certified its conclusions on these issues for interlocutory appeal pursuant to 28 U.S.C. Sec. 1292(b) (1988)
 
 
 [2]
 The PAYSOP gave ownership rights in the company through profit sharing contributions of Cone Mills's common stock. At the time of the LBO, the PAYSOP owned 1.3% of Cone Mills's common stock
 
 
 [3]
 Baynes was Cone Mills's Secretary and was the plan fiduciary for the 1983 ESOP from April 2, 1984, to June 20, 1984
 
 
 [4]
 In the December 1983 letters, management had estimated that the pension reversion surplus would be approximately $50 million. Because the reversion created taxable income, Cone Mills deferred receipt until 1985 so that it could reclaim 1981 taxes paid in excess of $17 million. This intentional delay in receiving the pension reversion surplus increased its value from the original estimate of $50 million to the $69 million received by December 1985
 
 
 [5]
 The district court found that Cone Mills made the following contributions: $36,023,000 on March 30, 1984; $3,948,815 on September 13, 1985; and $14,824,823 on September 15, 1985. These contributions did not coincide with Cone Mills's receipt of the pension reversion surplus. In comparison, Cone Mills received the pension reversion surplus over the following installments: $59,000,000 on May 20, 1985; $2,000,000 on September 27, 1985; $5,800,000 on December 6, 1985; and $2,200,000 on December 23, 1985
 
 
 [6]
 The district court specifically found that Defendants violated three fiduciary duties: (1) the duty to act in accordance with the documents and instruments governing the plan; (2) the duty to discharge the responsibilities of their offices for the exclusive benefit of the plan participants; and (3) the duty not to engage in certain prohibited transactions. All three of these findings first require a determination that the surplus claim was a part of the 1983 ESOP
 
 
 [7]
 The district court found that the surplus claim was ratified on May 15, 1984, at the Board of Directors meeting during which the Directors passed a general resolution ratifying all actions taken by the company's officers and directors on the company's behalf during the preceding year and another resolution that generally ratified all actions taken by Trogdon with respect to the company's benefit plans
 
 
 [8]
 Our reversal of the district court's judgment that there was a breach of fiduciary duty by necessity requires reversal of its holding that Trogdon and Baynes are jointly and severally liable for the breach of fiduciary duty. As the district court pointed out, only Cone Mills would be liable for the equitable estoppel and third-party beneficiary claims
 Our reversal of the prior judgment also requires that we vacate the award of attorneys' fees to Plaintiffs. We note, however, that if Plaintiffs are able to demonstrate detrimental reliance, prevail, and seek attorneys fees again, enhancement based on the risk of contingency would be inappropriate in light of City of Burlington v. Dague, --- U.S. ----, ---- - ----, 112 S.Ct. 2638, 2643-44, 120 L.Ed.2d 449 (1992). See also Broyles v. DOWCP, 974 F.2d 508, 509 (4th Cir.1992) (referring to the Supreme Court's holding in City of Burlington "that the typical fee shifting statute does not permit an attorney's fee award to be enhanced on account of contingency."); Drennan v. General Motors, Corp., 977 F.2d 246, 253 (6th Cir.1992) (rejecting multiplier for attorneys' fee award under ERISA to the extent the enhancement was for the risk of contingency), cert. denied, --- U.S. ----, 113 S.Ct. 2416, 124 L.Ed.2d 639 (1993). Reversal of the judgment also moots Plaintiffs' cross-appeal of the district court's denial of pre-judgment interest, which is a matter committed to the sound discretion of the district court. Quesinberry v. Life Ins. Co., 987 F.2d 1017, 1030 (4th Cir.1993).
 
 
 [1]
 A December 12, 1983 letter from Trogdon spoke of a surplus of "over $50 million." A company video presentation also indicated that the amount was "over" $50 million. Finally, Cone Mills' proxy statement indicated that the surplus was "approximately $50 million."
 
 
 [2]
 The amount came principally from interest earnings on the annuities, and also to an unspecified extent from tax savings achieved as a result of deferring distribution of the surplus
 
 
 [3]
 The right reserved in the December 15, 1983 letter to change did not arise prior to March 26, 1984 since governmental approval did occur and the management's bid for the company was successful. In other words, every condition specified by the Trogdon letter was met
 
 
 [4]
 Specifically, Trogdon testified that the "take title" representation was a "promise," a "commit[ment]," and a "binding obligation." He testified, however, that the promise was capped at $50 million, an interpretation not only contradicted by the language of his December 15, 1983 letter, but also by the repeated observations that the surplus was worth "over $50 million," not capped at $50 million. In any event, the value of the promise of the surplus when made did not ascertain the worth of the surplus on termination
 
 
 [5]
 Judge Niemeyer is of the view that the district court's labeling of the estoppel at issue as "equitable" rather than "promissory" should preclude our passing judgment on the latter. Such a view, it seems to me, exalts form over substance
 First, it is abundantly clear that the district court understood that the gravamen of the plaintiffs' complaint was a broken promise:
 The issue of whether the plaintiffs ... reasonably relied upon any of the alleged promises of the defendants has been a much-discussed topic during the three-year history of this litigation.
 J.A. at 356 (District Court's "Findings of Fact, Conclusions of Law, and Order") (emphasis added).
 In a final pre-trial conference held on January 17, 1991, the court raised the reliance issue once again. After a thorough discussion of the issue, it was agreed that the trial would proceed without testimony concerning reliance. The plaintiffs would be allowed to attempt to convince the court that they should recover under theories not requiring reliance, and the defendants would be allowed to attempt to demonstrate that no person could reasonably have relied upon the alleged promises.
 Id. (emphasis added).
 In summary, the promise to contribute "the" pension reversion was clear and unqualified. Unlike the promises of post-LBO benefits, which were generally couched in terms of expectations or predictions, or which were effectively disclaimed, the pension reversion promise was just that--a promise.... This unqualified promise gives rise to liability to the plaintiff class for breach of fiduciary duty, and possibly under contract law principles, as discussed in the conclusions of law.
 Id. at 358 (emphasis added).
 Admittedly, as Judge Niemeyer indicates, the district court labelled its discussion "equitable estoppel." Given its discussion of why it reserved the finding of reliance, it is clear that the district court's concern was actually with promissory estoppel. See J.A. at 378 (Findings of Fact, Conclusions of Law, and Order) ("In the case before this court, Cone made authorized promises which, if kept, would yield substantial additional benefits to the Cone salaried employees. Cone ... has attempted to hide behind plan documents which they claim permit them to renege on its promises. Simply stated, the doctrine of estoppel does not allow such behavior.") (emphasis added). As shown in the body of this concurrence, it is technically promissory estoppel that does "not allow [the] behavior" that so offended the district court.
 Because it is plain that the district court merely mislabelled the branch of estoppel it considered, there is no valid reason to prohibit this Court or the district court itself from investigating promissory estoppel as a means of recovery. A review of opinions from this court and others suggests that the confusion here exhibited is by no means rare. Indeed, the first case on which Judge Niemeyer relies to argue that promissory estoppel is unavailable in the ERISA context was itself a case considering an equitable estoppel claim. See Miller v. Coastal Corp., 978 F.2d 622 (10th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 1586, 123 L.Ed.2d 152 (1993). There, plaintiff "argue[d] that ... defendants are equitably estopped from now denying the[ ] benefits." Id. at 624 (emphasis added). In rejecting the plaintiff's equitable estoppel claim as preempted by ERISA, the Tenth Circuit quoted its earlier precedent to the effect that "we will not import notions of promissory estoppel into ERISA." Id. at 625 (citation omitted). Just as the district court here conflated notions of promissory and equitable estoppel, so did the Miller court. See also Geva v. Leo Burnett Co., 931 F.2d 1220, 1223 n. 3 (7th Cir.1991) ("As we have earlier noted, Illinois at one time maintained a distinction between promissory and equitable estoppel, but those doctrines seem to overlap in great part today."); Schalk v. Teledyne Inc., 1993 WL 432404, * 4, 1993 U.S. Dist. LEXIS 10885, * 14 (W.D.Mich. July 8, 1993) ("[T]he court notes that although the plaintiffs here have pleaded a promissory estoppel claim, they proceed on the theory of equitable estoppel.... The two theories are distinct and the elements are not interchangeable. Nevertheless, the defendants have long been aware that plaintiffs have relied upon the principles of equitable estoppel to support their claim.") Indeed, the Fourth Circuit itself is not free of the doctrinal confusion, as is demonstrated by an opinion that I and Judge Niemeyer joined just two years ago. See Lawrence v. Mars, Inc., 955 F.2d 902, 907 (4th Cir.) (doctrine of "equitable estoppel" does not apply because "promise " not definite enough) (emphasis added), cert. denied, --- U.S. ----, 113 S.Ct. 76, 121 L.Ed.2d 40 (1992).
 In the present case it is clear that the district court made a finding that a promise existed, and reserved the question of whether there was reasonable and detrimental reliance. While I do not celebrate the confusion engendered by the several equitable doctrines that make up the catch-all of "estoppel," it seems to me that we should recognize that courts often conflate the doctrines. We should not, through an overly formalistic application of language, deny the plaintiffs the right to demonstrate reliance in accord with the agreement reached by the district court, the plaintiffs, and the defendants. Regardless of whether Cone Mills actually made a misrepresentation on December 15, 1983, when it gave the employees its promise, the employees subsequently suffered the effect of a misrepresentation.
 
 
 [6]
 In addition, since the Cone Mills employees seek to increase the contributions to the fund, there is no concern as in our earlier cases, that the actuarial integrity of the plan is threatened with respect to some employees for the benefit of others
 
 
 [7]
 I want to underscore that in no way do I mean to reject the guidance of Coleman, Singer, or any other of our earlier cases. The Coleman rule is a sound one. Estoppel should not be employed to give force to unauthorized, oral promises that contradict the written terms of an established plan. As indicated above, however, I believe that where no plan exists, when an authorized promise is unambiguously made and relied upon, and the promise pertains to an area to which the contemplated Plan would relate, equitable relief is appropriate
 I must disagree with the suggestion advanced by Judge Niemeyer in his dissent that courts have treated promissory estoppel differently from equitable estoppel with respect to ERISA preemption. Two of the three cases relied upon by Judge Niemeyer actually indicate the reverse. See Miller v. Coastal Corp., supra note 5 (applying Tenth Circuit's preemption rule with respect to promissory estoppel to a claim based on equitable estoppel); Williams v. Bridgestone/Firestone, Inc., 954 F.2d 1070, 1072-73 (5th Cir.1992) (treating all estoppel-based federal common law claims alike). But see Alday v. Container Corp. of America, 906 F.2d 660, 666 (11th Cir.), (arguably holding that only equitable estoppel can be employed in ERISA context, and only when terms of plan are ambiguous), cert. denied, 498 U.S. 1026, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991).
 Those courts that have precluded the use of either promissory or equitable estoppel have done so in the name of the integrity of the written plan and the actuarial significance of modification of the plan. As argued throughout this concurrence, these concerns are simply inapposite here.
 
 
 *
 I do not read the decision of the district court on this point as contrary to the position expressed in this concurrence. Rather, it appears that because the district court had expressly agreed to withhold any finding on reliance pending certification of the legal issues to this court, it believed it was constrained not to render any finding on reliance. While I believe it would have been justified in doing so prior to this appeal, I do not believe that anything in the decision of this court precludes it from doing so on remand