Gordon RICHMOND, et al., Plaintiffs,

v.

NCR CORPORATION, Defendant.

No. C–3–01–133.

United States District Court,
S.D. Ohio,
Western Division.

Sept. 13, 2002.

Robert Armand Perez, Cincinnati, OH, Jordan M. Lewis, Milwaukee, WI, for Plaintiffs.

Lee A. Freeman, Jr., James T. Malysiak, Freeman Freeman & Slazman, Chicago, IL, Susan Russell Chema, NCR Corp., Dayton, OH, for Defendant.

## DECISION AND ENTRY SUSTAINING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. # 19) AND OVERRULING, AS MOOT, PLAINTIFFS' MOTION FOR CERTIFICATION OF THE CLASS (DOC. # 15); JUDGMENT TO ENTER FOR DEFENDANT AND AGAINST PLAINTIFFS; TERMINATION ENTRY

RICE, Chief Judge.

Plaintiffs Gordon Richmond and Linda Gamel bring this action against Defendant NCR Corporation ("NCR"), on behalf of themselves and a class of former NCR employees (collectively "Plaintiffs"). The Plaintiffs claim that they have vested rights in certain retirement benefits which NCR guaranteed to them upon their retirement,[1] rights which they allege NCR violated when it eliminated or amended said benefits. They have plead two counts: 1) enforcement of terms of their

---

**1.** Gamel is the widow of a former NCR employee within the defined class, and therefore claims an interest in this litigation as a beneficiary under her late husband's coverage.

benefit plan, pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B) ("ERISA"); and 2) promissory estoppel, pursuant to federal common law and ERISA, 29 U.S.C. § 1132(a)(3). Presently, they move for class certification (Doc. # 15). NCR disagrees with Plaintiffs' assessment of their legal rights, opposes class certification (Doc. # 17), and now moves for summary judgment (Doc. # 19).

## I. *Factual Background* [2]

The material facts are straightforward and not in dispute, and can be summarized by reference to Plaintiffs' Complaint and the various exhibits attached both thereto and to the parties' respective briefs, upon which the parties mutually rely. In December, 1992, by written memorandum, bearing the subject heading "Special Pension Enhancement Program," NCR offered employees of its U.S. Group an "enhanced" early retirement pension plan ("SPEP").[3] The employees were told that participation in the SPEP would provide "an unreduced pension and a lump-sum cash payment." The eligibility criteria were as follows: 1) employee had to be in the U.S. Group; 2) employee had to be a full-time active employee who had participated in the existing "NCR Pension Plan 001" for at least five years; 3) employee had to be at least 55 years old by January 31, 1993; and 4) employee had to volunteer for the SPEP by January 29, 1993. Under the sub-heading of "The Enhancement,"

NCR stated that the following benefits would be offered: 1) removal of the early retirement actuarial reduction (which, under the then-existing pension plan, would reduce a retiree's pension benefits at 6% per year, down to a certain minimum amount); 2) a pre-tax, lump sum payment of $10,000; and 3) payment of any unused 1993 vacation.

In addition, under the separate subheading of "Health and Life Insurance," NCR enumerated the plan names of the "current" health and life insurance coverages which would be provided to employees with "at least ten years of vesting service." The available coverages varied depending on whether the employee retired between the ages of 55 and 62 (option of "Plan A" or "Plan C"), between 62 and 65 ("Choice 1"), or at the age of 65 or above ("Supplemental Plan to Medicare"). NCR also stated that all retirees and their spouses would be transferred to NCR's Supplemental Plan to Medicare ("Medicare Supplement") upon their reaching age 65. No details of the various coverages were provided therein.

Under a third sub-heading, "Communications to Eligible Employees," employees were informed that NCR would be sending each of them, under separate cover, an informational packet which would include an executive summary of the SPEP, a detailed analysis of the pension calculation, a summary of each medical and life insurance plan, and a set of common questions,

---

**2.** Typically, in ruling on a motion for summary judgment, the Court would construe the facts, and all reasonable inferences drawn therefrom, in the light most favorable to the non-moving party, which in this case is Plaintiffs. However, the underlying facts in this case are not in dispute, and all that remains are questions of law.

**3.** It is worth noting at the outset that the enhancement of early retirement was not ear-

ly retirement itself. NCR was not creating a new class of eligible early retirees, as employees at least 55 years old were eligible for early retirement prior to the offer of the SPEP. (*See, e.g.,* 1990 NCR Group Management Plan for Management Employees (Part VI), attached to Doc. # 19 at Appendix Ex. 6.) The enhancement was merely the aggregate of the pension benefits which NCR was adding to the extant early retirement package.

along with the answers thereto ("Q & A Form"). Finally, under a fourth sub-heading, "Resources Available to Eligible Employees," NCR informed the employees that it would publish the numbers of three toll-free telephone support hotlines, the first to answer questions about retiree health care plans, the second to answer questions about the SPEP, and the third to answer miscellaneous questions. It also informed the employees that it would make available a retirement planning book (to be included in the subsequent packet of information), an explanatory videotape presentation which could be obtained by individuals or groups at their district offices, and an additional toll-free support hotline, to offer financial counseling. Employees were encouraged to avail themselves of these resources.

Several days after the initial written correspondence, NCR mailed the informational packet. The introductory memorandum included therein reiterated the salient features of the SPEP, the eligibility criteria, and the resources of which the employees were encouraged to take advantage in order to understand better the details of the SPEP, other retirement benefits, and their options in general.[4] NCR also reiterated therein that "the current retiree health and life insurance coverages will be available to employees with at least ten years of vesting service." In addition, the Q & A Form made it clear that "vesting service" should be understood as such was defined in the Retirement Plan, and that in addition to having at least ten years of such vesting service, a retiree, and also his or her spouse, would be required to waive the

right to benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. § 1161, et seq. ("CO-BRA"). Both Richmond and Gamel's husband, Walter Gamel, opted to participate in the SPEP.

In September of 1998, Plaintiffs were informed that NCR was no longer going to offer its Medicare Supplement. Other announced changes included increased premiums, deductibles, co-payments, and out-of-pocket costs.

Plaintiffs do not contend that they did not receive the three specified SPEP benefits with respect to their pension benefits (i.e., the elimination of the 6% yearly reduction, the cash payment, and the payout of the balance of their accrued 1993 vacation time). Their cause of action turns exclusively on the matter of health insurance benefits. Furthermore, Plaintiffs clarify in their Memorandum in Opposition (Doc. # 21) that in stating their first claim for the enforcement of plan terms under § 1132(a)(1)(B), they are not seeking to enforce the terms of any pre-existing health insurance plan. Instead, it is their contention that NCR, through the issuance of all of the materials detailing the proposed SPEP, actually created a separate and independent benefits plan, also subject to ERISA, and that their rights vested thereunder upon their acceptance of early retirement. They are the terms of that plan which they are seeking to enforce. (Doc. # 21 at 17.)

NCR argues that the SPEP related exclusively to pension benefits. Insofar as the correspondence and related materials

---

4. The introductory memorandum included in the informational packet, not submitted into evidence by Plaintiffs, was attached as Exhibit 4 to NCR's Evidentiary Appendix Supporting Defendant's Summary Judgment Motion, which itself was attached to NCR's Motion for Summary Judgment (Doc. # 19). Melanie Young, the individual who managed the NCR SPEP during the relevant time period, authenticated this memorandum, as well as the other exhibits to NCR's Motion, by affidavit, as attached to NCR's Reply Memorandum (Doc. # 22).

it sent to U.S. Group employees are concerned, it argues that these materials merely reiterated that in addition to the SPEP, early retirees would also receive health and life insurance coverage per the conditions existing at the time they accepted the SPEP, hence the explicit reference to the availability of "current retiree health care and life insurance coverages." Moreover, NCR argues, had Plaintiffs referred to the existing health and life insurance plan materials, and/or had they availed themselves of resources which it made available to help them understand their retirement benefits, most notably the videotape demonstration, they would have understood that the terms and conditions of their health and life insurance coverages were subject to change. Finally, NCR argues that under no set of circumstances could it be inferred reasonably that NCR engendered, in offering the SPEP, a new and wholly distinct health insurance plan, subject on its own to the dictates of ERISA.

At bottom, this case turns on a single question: did NCR create a new and entirely independent health insurance policy when it notified U.S. Group employees that, in addition to the enhanced pension benefits, they would receive certain health insurance coverage upon early retirement? For the reasons discussed herein, the Court agrees with NCR that it did not. Accordingly, NCR's Motion for Summary Judgment will be SUSTAINED. Plaintiffs Motion to Certify shall be OVERRULED as moot.

## II. Standards Governing Motions for Summary Judgment

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991)(The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.")(quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law, Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994)("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the factfinder. 10A Wright, Miller & Kane, Fed-

eral Practice and Procedure, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), cert. denied, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Sys., Inc.*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992)("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment...."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

### III. *Analysis*

■ ERISA is a comprehensive federal law governing employee benefits. *See Thompson v. American Home Assurance Co.*, 95 F.3d 429, 434 (6th Cir.1996). 29 U.S.C. § 1002(1) states:

The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of

insurance or otherwise, ... benefits in the event of sickness ... [and] ... death ....

Assuming no other factor removes the plan from the governance of ERISA, a medical insurance plan is, by its very nature, an ERISA "welfare plan." *See Sprague v. General Motors Corp.*, 133 F.3d 388, 400 (6th Cir.1998). Plaintiffs do not dispute that NCR maintained a welfare plan prior to it offering the SPEP, nor does NCR dispute that it offered such a welfare plan to Plaintiffs. The parties' disagreement has to do with the particular plan under which Plaintiffs have brought this suit. Plaintiffs claim NCR created a wholly independent welfare plan when it offered, and they accepted, the SPEP, and that said plan guaranteed their vested future right to, among other things, the Medicare Supplement. NCR contends it did no such thing, and that the terms and conditions of the health and life insurance coverages (i.e., the relevant welfare plan(s)) were at all times governed by existing plan documents, which expressly stated that NCR retained the right to amend its welfare plans, and even terminate them altogether.

The Court will consider NCR's Motion for Summary Judgment within the context of Plaintiffs' two claims.

### A. *Enforcement of Rights Under Plan Terms (Count I)*

29 U.S.C. § 1132(a)(1)(B) allows participants and beneficiaries of an ERISA welfare plan to seek the enforcement of rights under the terms of such plan. Because the parties to this action dispute the existence of the particular "ERISA plan" which Plaintiffs believe exists, the Court's first task, with respect to Count I, is to determine whether, as a matter of law, the purported plan even exists.

In determining whether an ERISA plan exists in the first instance,

"the court must look to see ... whether from the surrounding circumstances a reasonable person [could] ascertain the intended benefits, the class of beneficiaries, the source of financing, and procedures for receiving benefits." *International Resources, Inc. v. New York Life Ins. Co.*, 950 F.2d 294, 297 (6th Cir.1991) (citation and internal quotation omitted). No right can exist under an ERISA plan unless it is set forth in a writing. *Sprague*, 133 F.3d at 402–03; 29 U.S.C. § 1102(a)(1). In this case, the writings to which Plaintiffs point as evidence of the existence of their retirement welfare plan are (1) the initial memorandum, (2) the Q & A Form (included in the informational packet), and (3) the executive summary of Plan C (also included in the informational packet). (Compl.¶ 12.)

Plaintiffs' argument, that these three documents engendered a free-standing ERISA welfare plan, is unreasonable. The initial memorandum, dated December 10, 1992, concerned, as its subject heading makes clear, NCR's proposed "Special Pension Enhancement Program." (Compl. at Ex. A.) Thus, the information contained therein was identified first and foremost as relating to pension benefits. Even if the Court does not hold Plaintiffs accountable for knowing and understanding the distinct definitions of "welfare plan" and "pension plan," as defined by ERISA, *compare* 29 U.S.C. § 1002(1) *with id.* § 1002(2), everyday usage instructs that a reference to "pension" benefits bears no obvious relation to other forms of benefits, such as those for health and life insurance. Turning to the text of the first page of that memorandum, all references to "enhancement" directly concern the guarantee of an enhanced *pension plan;* there is no reference to an enhanced health insurance plan. On the second page, NCR informed U.S. Group employees that eligibility for the SPEP would be tied to cur-

rent vested status in the existing NCR pension plan. In the middle of that page, it sets out under the bold sub-heading, "The Enhancement," the three specific features of the SPEP, none of which relate to health insurance. At the bottom of the second page, under the bold sub-heading, "Health and Life Insurance," NCR expressly stated: "The current retiree health care and life insurance coverages will be provided to employees with at least ten years of vesting service." The memorandum then enumerates the three available welfare coverages, specifying that the availability of coverage under any of the three given plans turns upon the employee's age on the date of his or her retirement. It further notes, under the same sub-heading, that "[a]ll retirees and spouses will be converted to the Supplemental Plan to Medicare upon reaching age 65." Nothing under that sub-heading discusses any details of the coverages, or which party would be responsible for coverage payments. Finally, under the sub-heading, "Resources Available to Eligible Employees," NCR noted that three separate toll-free hotlines would be available, one of which could be utilized to ask questions about health care plans, and a second of which could be utilized to ask questions about pension benefits and the SPEP.

It is impermissible, as a matter of logic and common sense, to interpret said memorandum as suggesting that NCR intended to establish a welfare plan separate and distinct from its *current* retiree health care and life insurance coverages." Plaintiffs submit in their Memorandum Contra

that the "most sensible" way to construe the provision on health care and life insurance is to find "that participating employees can lock in—or become vested—at the existing health plan benefits at its 'current' level if they choose to participate in the Special Pension Enhancement Program plan." (Doc. # 21 at 7.) "This interpretation," they argue, "is buttressed by NCR's use of the word 'vesting' in the same sentence." (*Id.*)

The Court disagrees. The word "vesting," as used in the term "vesting service," directly and unambiguously takes its meaning from the "current retiree health care and life insurance coverages," and it follows that the "current ... coverages" are the source of whatever benefits to which Plaintiffs were entitled. (The fact that an external source is not referenced in that particular memorandum is irrelevant.)[5] Whatever the proper interpretation of "vesting services," such cannot be attempted without first referring to the "current ... coverages," and Plaintiffs make no attempt to explain how their suggested interpretation comports with the language contained therein. Their interpretation of the initial memorandum is confounding, especially when taken alongside the introductory memorandum included in the informational packet, mailed to employees several days later, which reiterated the highlights of the SPEP. (Doc. # 19 at Appendix Ex. 4.) Under the bold sub-heading, "The Features of the Program," NCR set forth the same three features of the SPEP, all related to pension benefits. Again, there is no indication that

---

**5.** If an employer were always obligated to provide cross-references to detailed definitions of particular terms, its ability to communicate with its employees in succinct, memorandum fashion, would be curtailed. While it would be obtuse for an employer or a court to hold non-attorney employees accountable for understanding terms of art not generally used in everyday conversation, there is nothing wrong with using language which is sufficient to put a reasonable employee on clear notice that terms used in a memorandum or the like take their meaning from an external source, even if the external source is not expressly referenced therein.

NCR intended that health and life insurance benefits would be enhanced. Even the toll-free hotlines were set up separately, one for questions concerning pension benefits and the features of the enhancement, and another for questions about welfare benefits.

The Q & A Form (Compl. at Ex. B) is also of no assistance. In the less than two pages devoted to "post-retirement medical benefits," *set out separately from the section related to enhanced pension benefits,* the Q & A Form references the plan names of the various welfare coverages which exist, and sets out answers to several generic questions related to retirement welfare benefits. It also includes a chart comparing the basic coverages under Plan A and Plan C (the alternatives available to retirees between the ages of 55 and 62). There is no chart depicting the basic coverages under Choice 1 (for retirees between the ages of 62 and 65) or the Medicare Supplement, and it makes no mention of "vested" or "guaranteed" rights to anything related to welfare benefits. Importantly, in repeating that "ten or more years of Vesting Service" is required to qualify for any of the retirement plans, it specifically references "the Retirement Plan" as the source of the definition of "vesting services." Frankly, it is irrelevant what the meaning of "vesting services" is. It is enough to note that "ten years of vesting services," a prerequisite to retirement coverage, takes its meaning from some external source, and it is that external source (i.e., the Retirement Plan) which sets forth the parameters of the various retirement health care coverages under discussion. This fact is highlighted further by the inclusion, at the back of the Q & A Form, of a bullet point summary of the various welfare plan coverages. Nothing in this document provides more than a cursory description of the available benefits, or the procedures for submitting claims or receiving benefits. Plaintiffs cannot purport to rely on the Q & A Form as a source of their rights and yet overlook references to external documents contained therein (which they may find inconvenient). This document, like the initial memorandum, could not be interpreted by any reasonable individual as being a source document of a welfare benefit plan. It simply does not satisfy the elements required of an ERISA plan written instrument. *See, e.g., Elmore v. Cone Mills Corp.,* 23 F.3d 855, 861–62 (4th Cir.1994) (holding that where "[t]he only way an employee could ascertain the procedures for obtaining benefits would be to refer to the [original plan documents]," employees cannot enforce terms of informal writings as free-standing ERISA plans); *see also Williams v. WCI Steel Co., Inc.,* 170 F.3d 598, 604 (6th Cir.1999) (following *Elmore* where an agreement between management and labor provided that funds from a trust account would fund retiree benefits but did not specify how claims would be processed and benefits paid).

The same is true of the third document relied upon by Plaintiffs (Compl. at Ex. C), which is a summary of what NCR denominated "Plan C," one of the welfare plan coverages available to retirees between the ages of 55 and 62. This document merely summarizes the benefits provided under Plan C, and compares them to those available under Plan A and Choice 1. Again, it notes that upon turning 65, a beneficiary's welfare coverage is automatically converted to NCR's Medicare Supplement (which, obviously, supplements the Medicare benefits to which the individual would be entitled as a matter of federal law), but nothing therein makes any reference to, or even remotely suggests the existence of, "guaranteed" or "vested" rights to the Medicare Supplement, and there is nothing

describing the procedures for submitting claims or receiving benefits.

Plaintiffs' theory that NCR created an entirely new welfare plan by offering the SPEP has been addressed by the Sixth Circuit. In a similar setting, where employees of General Motors ("GM") asserted a claim that GM revoked certain benefits which, they argued, had vested upon their taking early retirement, the Sixth Circuit made it clear that the creation of separate ERISA plans by "binding bilateral contracts," on top of existing ERISA plans, is not to be inferred lightly. *See Sprague*, 133 F.3d at 402–03. It is true, as Plaintiffs point out, that there are differences between the facts of this case and the facts of *Sprague*. For one, the members of the proposed class in this case would number fewer than 1000, whereas the proposed class in *Sprague* exceeded 80,000 persons. A second distinction is that some of the plaintiffs in *Sprague* argued that a separate and enforceable ERISA plan had been created on the basis of oral representations made by GM, an argument which Plaintiffs herein do not make, and which is obviously defective given the fact that ERISA plans, to be valid, must be evidenced by a written instrument. *See id.* Be that as it may, the issue of numerosity and the fact that Plaintiffs herein are not arguing that NCR made binding oral representations are immaterial to the merits. *Sprague* also addressed the value of written documents which do not purport on their face to be ERISA plan source documents, and its holding on that issue controls. *See id.* at 403.

"Every ERISA plan must specify a funding mechanism, must allocate operational and administrative responsibilities, and must state how payments are made to and from the plan." *Id.* (citing 29 U.S.C. § 1102(b)(1)-(2) & (4)). Documents which do not conform to these criteria cannot be considered plan documents. *See id.; Gable v. Sweetheart Cup Co., Inc.*, 35 F.3d 851, 857 n. 2 (4th Cir.1994). For the reasons already stated, it would be evident to a reasonable person that the documents upon which Plaintiffs rely, even when taken together, do not conform to the writing requirements of ERISA, and cannot be construed as ERISA plan documents. Taken by themselves, nothing in these documents refers to operational and administrative responsibilities, and while the summary of Plan C gives an overview of how costs were to be allocated generally, there is no mention, in any of the documents, of how claims were to be processed, payments to be made, or benefits to be paid.

In *Sprague*, the plaintiffs had argued that GM entered into bilateral agreements which could be viewed either as wholly independent welfare plans or as amendments to the existing welfare plans. In response, the Sixth Circuit noted that to "sanction informal 'plans' or 'plan amendments'—whether oral or written—would leave the law in a state of uncertainty and would create disincentives for employers to offer benefits in the first place." 133 F.3d at 403. Under the facts presented herein, there can be no doubt that if the Court were to give credence to the contention that NCR created a wholly independent ERISA plan by virtue of publishing to its U.S. Group employees the three documents on which Plaintiffs rely in this case, ERISA law would be undermined. Such a result would leave the door open to any number of disgruntled beneficiaries to segregate, selectively, memoranda and brochures containing favorable *but incomplete* information about their benefits, and to fashion them as creating an independent

812

ERISA plan.[6]

Plaintiffs state that they do "not allege that the Special Pension Enhancement Program documents amended" the existing NCR health and life insurance plan. (Doc. # 21 at 10.) "Instead, [they contend] that NCR created a free-standing ERISA plan with its dissemination of the Special Pension Enhancement Program documents," and that this ERISA plan must be enforced pursuant to "federal common law."[7] (*Id.*) Again, the Court disagrees. Plaintiffs cannot walk away from the difficulty of proving that an existing plan was amended simply by phrasing their argument as one that an entirely separate ERISA plan was created. Such a dichotomy, as already suggested, would place employers on egg shells whenever they distributed plan updates, proposals, newsletters, or bona fide amendments. Furthermore, regardless of the theory on which Plaintiffs base their argument, the bottom line is that unless they can demonstrate that the documents on which they rely satisfy the requirements of ERISA plan documents, no separate plan can be recognized.

▉▉▉ Although it is enough to recognize that Plaintiffs have failed to demonstrate that the documents upon which they rely created a free-standing ERISA welfare plan, given Plaintiffs' vociferous insistence that NCR gave them "vested rights" in the Medicare Supplement, it is worthwhile to examine the difficulty of demonstrating that an employer has given such rights, where the existing plan documents themselves make it clear that welfare benefits do not vest. "Employers are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Sprague*, 133 F.3d at 400 (citing *Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995)). "Because vesting of welfare plan benefits is not required by law, an employer's commitment to vest such benefits is not to be inferred lightly; the intent to vest 'must be found in the plan documents and must be stated in clear and express language.'" *Id.* (quoting *Wise v. El Paso Nat'l Gas Co.*, 986 F.2d 929, 937 (5th Cir.), *cert. denied*, 510 U.S. 870, 114 S.Ct. 196, 126 L.Ed.2d 154 (1993)). Employees generally have no vested rights in welfare benefits, and to demonstrate that they do, they must show that their employer has bargained away its right to modify or terminate them. *See*

**6.** For example, it is easy to imagine that a prospective employee might request from his prospective employer a description of available health benefits, and it is easy to imagine that the employer would send that individual a summary of such without necessarily mentioning its reservation of rights to change said benefits. It is hard to imagine that if the individual accepts the employer's terms of employment, inclusive of the same health benefits given to other employees, but subsequently finds his benefits cut, that he would be able to point to the summary information previously sent to him, and the absence of any reservation of rights clause therein, as evidence that he was given an ERISA plan governed by a different set of terms than those governing the plan applicable to everybody else. Plaintiffs are in no different a situation.

**7.** In *Cattin v. General Motors Corp.*, the Sixth Circuit stated that where an employer bargains away its right to modify an ERISA welfare plan, the terms of that modification, though governed by ERISA, are to be enforced pursuant to the federal common law of contracts. 955 F.2d 416, 425 n. 6. Other courts have likewise ruled that where employers and employees enter into severance agreements not accounted for under the terms of a pre-existing ERISA plan, the terms are to be construed in accordance with contract principles of federal common law. *See, e.g., Bock v. Computer Assocs. Int'l, Inc.*, 257 F.3d 700, 704 (7th Cir.2001).

*Nester v. Allegiance Healthcare Corp.*, 162 F.Supp.2d 901, 908 (S.D.Ohio 2001).

In *Sprague,* much was made of the fact that GM had articulated its right to amend or even discontinue its welfare plan at any time. So, too, does NCR try to make much of that fact herein. NCR points to the 1993 Group Benefits Plan for Salaried Employees (i.e., the "Retirement Plan" to which the Q & A Form referred), and the fact that, under Part I,[8] Section 12, paragraph F, it retained the right to "amend the Plan in whole or in part," or "change or cancel the Plan, or any benefits under the Plan, at any time." (Doc. # 19 at Appendix Ex. 7.) It contends that this plan was in effect at the time Plaintiffs accepted early retirement. (Doc. # 19 at 4.) Moreover, NCR states that the language of the 1993 Retirement Plan merely restated the language of the 1990 Retirement Plan, which it contends was in effect at the time the SPEP was announced. (*Id.* & *id.* at Appendix Ex. 6.) NCR also makes much of the fact that in the informational videotape, which it made available to all U.S. Group employees and which it encouraged the employees to view, the point was restated on several occasions that NCR retained the right to amend its retirement welfare plans.

As to the caveat in the 1990 and 1993 Retirement Plans, Plaintiffs reiterate that the information they received pursuant to the SPEP offer did not directly refer to such, and that because their claim is based on a wholly separate ERISA plan, NCR's reservation of rights in the 1993 Retirement Plan, which does not appear in any of the documents upon which they rely, is irrelevant. (Doc. # 21 at 6–7.) They also claim that NCR did not distribute the 1993 Retirement Plan until after they had accepted early retirement. As to the videotape, they argue that anything stated therein, even if they viewed it (which Gamel did not, because it was not made available to employees' spouses), is irrelevant.

As to the latter point, the Court agrees. NCR can no more rely upon oral statements to enforce ERISA welfare plan rules than can Plaintiffs to assert welfare plan rights. In fact, even if videotape statements are not to be regarded as oral statements,[9] U.S. Group employees were not required to view the videotape as part of their early retirement agreement, and it would be unfair to hold them accountable for not doing so.

On the other hand, with regard to the "reservation of rights" language contained in the 1990 and 1993 Retirement Plans, the Court agrees with NCR that it reserved

---

**8.** Part I is denominated "General Provisions," and is applicable to the whole of the Retirement Plan. In paragraph 17 of their Complaint, Plaintiffs allege that after the initiation of the SPEP, NCR distributed "what it claimed to be the controlling Plan documents." However, these documents, Plaintiffs allege, "[do] not contain all of the terms of the [SPEP]; nor [do they] reserve to NCR the right to later change plan terms." In this regard, Plaintiffs have mischaracterized what they were given. In their Complaint, they direct the Court's attention only to Part VII of the 1993 Retirement Plan, which concerns retirement welfare plans in particular. To answer the first allegation of paragraph 17, it suffices to note that Part VII does not contain

the terms of the SPEP because the SPEP was concerned only with pension benefits, not welfare benefits. The two were never related. As to the second allegation therein, Part VII does not reserve to NCR the right to change plan terms because NCR had already reserved that right in Part I. (As an added observation, it is incongruous for Plaintiffs to argue that they are not relying on the actual Retirement Plan documents to make their case, and then turn around and point to said documents as being defective.)

**9.** *See, e.g., Russell v. Paul Revere Life Ins. Co.,* 148 F.Supp.2d 392, 410 n. 17 (D.Del.2001) (treating videotape as a plan document).

its right to modify or terminate welfare benefits. To be sure, there are two potential discrepancies in NCR's reliance on these documents. *First,* NCR has not disputed Plaintiffs' claims that they did not receive the 1993 Retirement Plan documents until after they accepted the offer of early retirement. *Second,* the 1990 Retirement Plan to which NCR refers in its Motion for Summary Judgment (Appendix Ex. 6) is denominated "Group Benefits Plan for Management Employees," and the Court is unaware that any of the Plaintiffs were "management employees" and not regular "salaried employees," such that this particular document applied to them. At the end of the day, however, these potential discrepancies are of no consequence. As already noted, it is really immaterial whether Plaintiffs had the 1993 Retirement Plan in their possession when they accepted early retirement. As the Court has stated, the SPEP informational materials which NCR distributed made it clear that the terms of the retirement welfare plans, which were not the concern of the SPEP in any event, were defined in some external source. Because no reasonable person could have understood that these materials set forth the extent of the welfare benefit plan structure, the obvious thing to do would have been to refer to the existing NCR plan documents. If the official 1993 documents had not yet been distributed, then the reasonable thing for an employee to do would have been to refer to the most recent plan document in effect. NCR states that the controlling documents

prior to the publication of the 1993 Retirement Plan were those associated with the 1990 Retirement Plan. Because Plaintiffs do not dispute that such a plan and its related documents, inclusive of a reservation of rights clause, were in existence and effective prior to their (or their employee spouses') retirement, it makes no difference that the specific document to which NCR refers in its Motion appears directed toward management and not salaried employees. It is enough to realize that the informational materials distributed pursuant to the SPEP did not control, and a reasonable employee would have known to refer to the appropriate external source document for a description of his or her benefits, and any reservation of rights NCR may have retained. This was no doubt the reason NCR encouraged all U.S. Group employees to utilize the various supplemental informational materials it had made available.

To be sure, it would be problematic if NCR did not distribute to its employees any form of plan summary as required by ERISA. *See* 29 U.S.C. § 1022. The law requires that an employer provide a written plan summary "in a manner calculated to be understood by the average plan participant, and ... sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." *Id.; Sprague,* 133 F.3d at 400.[10] Whatever the result might be had NCR not distributed plan summaries as it is required to

---

**10.** In *Edwards v. State Farm Mut. Auto. Ins. Co.,* 851 F.2d 134, 136 (1988), the Sixth Circuit clarified that where the language of an ERISA plan summary distributed to an employee conflicts with the language of the primary plan documents, the language in the summary is binding. This issue is really not raised in this case because Plaintiffs' are disclaiming *in toto* the relevance of the language of the 1990 and/or 1993 Retirement Plans. It

is not their argument that the informational materials, particularly the summaries of NCR's various retirement welfare plans, conflict with, and therefore trump, the primary plan documents. Their argument is that the informational materials constitute in and of themselves the primary plan documents. The Court, therefore, need not conduct an *Edwards* analysis.

do, that is not the issue of which Plaintiffs' complain.[11] They do not contend that there was no such thing as a 1990 Retirement Plan, or a 1993 Retirement Plan. Indeed, the principal problem with NCR's reliance on these documents, they argue, is merely that the SPEP informational materials made no direct reference thereto. The lack of reference, they argue, means the contents of those documents, in particular the reservation of rights clause, were not incorporated, and therefore cannot control.

■ This argument lacks merit. The initial memorandum sent out by NCR announcing the offer of the SPEP, and the introductory memorandum included with the follow-up informational packet, both referred to the "current retiree health care and life insurance coverages." The Q & A Form was even more direct, making explicit reference to the "Retirement Plan." Finally, the summary of Plan C was clearly that: a "summary" of a plan. A reasonable employee would have realized that the details of the various coverages were described elsewhere, particularly given the absence of any indication of how claims were to be processed and benefits to be received. Furthermore, and importantly, the Sixth Circuit has made it clear that an employer "is not required to disclose in the summary plan descriptions that the plaintiff's benefits were not vested." *Sprague*, 133 F.3d at 401. Plaintiffs cannot get around this legal point by asserting that the summary was no summary at all, but was, rather, the actual plan document itself.

This latter point is crucial. The burden is on Plaintiffs to demonstrate a genuine issue of material fact as to whether NCR intended for welfare benefits to vest. *See, e.g., Stearns v. NCR Corp.,* 297 F.3d 706,

711 (8th Cir.2002) ("Plaintiffs have the burden of proof on the vesting issue."). It is not NCR's burden to show that it did not. Plaintiffs have not satisfied their burden. Indeed, their only basis for claiming that NCR clearly expressed its intent for their rights to the Medicare Supplement and other welfare benefits to vest is the fact that the documents mailed pursuant to the SPEP stated that welfare benefits for retirees and their spouses would be converted automatically to the Medicare Supplement upon turning 65. That is simply not enough. If the mere restatement of the benefits currently in effect could be construed as an enforceable guarantee of those benefits into perpetuity, then any free-standing memorandum or informational brochure stating the current status of available benefits would, if not inclusive of a disclaimer, give rise to an entirely new ERISA plan. Such a result would be absurd, and as the *Sprague* court and other courts have made clear, it is not required. *See* 133 F.3d at 401 (stating the rule and noting similar holdings).

For example, where plan summaries stated, "if you retire and are eligible for a pension you shall continue to have the same health coverage," and further informed employees that they would continue to receive benefits in retirement "until death or remarriage," the Sixth Circuit rejected the argument that this was "clear and express language" on the part of the employer that welfare benefits should vest. *Sengpiel v. B.F. Goodrich Co.,* 156 F.3d 660, 668 (6th Cir.1998). Importantly, the plan summaries issued to the plaintiffs in *Sengpiel,* at the time of their respective retirements, did not inform them that their employer retained the right to amend welfare benefits. *Id.* at 663. Plaintiffs at-

---

**11.** The result might also be different had Plaintiffs based their claim on deficiencies of the official plan documents, namely that they did not contain a reservation of rights clause.

tempt to distinguish *Sengpiel* on the ground that that case involved different questions of law. That is irrelevant. Regardless of what other legal questions that case posed, it squarely addressed the point of law under discussion herein, and the alleged "promises" or "guarantees" of vested rights addressed in that case were far more indicative of an intent to vest than that contained in the information provided by NCR, upon which Plaintiffs rely. In light of *Sengpiel*, the Court would be hard pressed to sanction a finding of vested rights on the facts of this case.

Finally, the Court notes that it is immaterial that early retirees were required to, and did, waive their rights to COBRA benefits in consideration of receiving retirement welfare benefits under any of the various NCR plans. In general, COBRA allows, in certain circumstances where coverage would otherwise be discontinued, employees and other qualified individuals, such as an employee's spouse, to elect continued coverage, at their own expense, under the terms of the employee's employer's welfare plan. *See* 29 U.S.C. §§ 1161 & 1163. An employee's retirement, for example, presents a circumstance under which the employee and his or her spouse may elect to receive continued coverage. *See id.* § 1163(2); *Youngstown Alum. Prods., Inc. v. Mid–West Benefit Servs., Inc.,* 91 F.3d 22, 26 (6th Cir.1996). It is a limited guarantee, however, and in the case of an employee's retirement, the employer is generally only required to offer coverage for 18 months thereafter. *See* 29 U.S.C. § 1162(2)(A)(1). Moreover, persons otherwise entitled to COBRA coverage lose their entitlement upon their qualification for Medicare benefits. *See* 29

U.S.C. § 1162(2)(D)(ii); *Youngstown,* 91 F.3d at 26.

What this means is that, in waiving their right to COBRA coverage, U.S. Group early retirees and their spouses (who were also required to waive their right to said coverage) gave consideration for the right to the pre-Medicare benefits offered by NCR. Because their COBRA rights would have expired, at the latest, upon their becoming eligible for Medicare, it is clear that Plaintiffs did not give up rights in exchange for NCR's Medicare Supplement. The Q & A Form itself makes this clear. It states that in order to qualify for "Choice 1," "Plan A," or "Plan C," the employee and his or her spouse must each waive his or her right to COBRA coverage. There was never any suggestion by NCR that COBRA coverage had to be waived in exchange for the Medicare Supplement, and to construe the Q & A Form as suggesting as much would be to overlook the obvious indicia to the contrary. As a final point, to the extent Plaintiffs did agree to waive COBRA coverage in exchange for coverage under one of the retirement plans, they did so subject to NCR's reservation of rights contained in whatever Retirement Plan was effective at the time of the transaction.[12]

The cases cited by Plaintiffs in support of their argument do not persuade the Court that a different result is warranted. In *Abbruscato v. Empire Blue Cross & Blue Shield,* the Second Circuit stated that "to avoid summary judgment on an ERISA contractual vesting claim, plaintiffs need only identify specific written language that is reasonably susceptible to interpretation as a promise." 274 F.3d 90, 97 (2nd Cir.2001). The court then held

---

**12.** As Plaintiffs point out, early retirees were required to sign election forms, indicating their awareness that participation in the SPEP was completely voluntary. Nothing contained in those forms suggests a relationship to enhanced welfare benefits. (*See* Doc. # 21 at Exs. 8 & 9.)

that language roughly equivalent to that employed in this case by NCR was ambiguous, and susceptible to the interpretation that it was a grant of vested rights.[13] The *Abbruscato* outcome is of no help to Plaintiffs. *First,* as NCR points out, in the Sixth Circuit, vesting "is not to be inferred lightly," *Sprague,* 133 F.3d at 400, and to overcome the presumption that an employer has not agreed to such, the plaintiff is required to identify "clear and express language" demonstrating as much. *Id.* This appears to impose a greater burden upon a plaintiff than the standard employed by the Second Circuit in Abbruscato. Indeed, in a companion case to Abbruscato, the Second Circuit acknowledged that it employs a less onerous standard than that used in the Sixth Circuit. *See Devlin v. Empire Blue Cross & Blue Shield,* 274 F.3d 76, 83 (2nd Cir.2001) (rejecting the "clear and express language" standard of *Wise, supra,* as adopted by the Sixth Circuit in *Sprague,* 133 F.3d at 400). *Second,* even putting aside the Sixth Circuit standard, the mere restatement of current health care coverages is not, in this Court's opinion, even *reasonably* susceptible to interpretation as a promise. This is particularly true in light of the language rejected in *Sengpiel.*

With good reason, Plaintiffs cite *Deboard v. Sunshine Mining and Ref. Co.,* 208 F.3d 1228 (10th Cir.2000), for the proposition that the materials sent to them by NCR constitute a free-standing ERISA plan which expresses the intent for welfare benefits to vest. In *Deboard,* the Tenth Circuit evaluated an identical claim, based on the following letter to company employees:

> For informational purposes only, this letter serves to advise you and your spouse of insurance entitlements which you would be eligible to receive should you voluntarily elect to retire during the window period under the Rule of 70 plan (the "Plan").

> First, the Plan provides that you and your eligible dependents would be entitled to receive health care under our current group hospitalization plan with Massachusetts Mutual, fully paid for at Woods Petroleum Corporation's expense *until the time of your death.* At that time, the hospitalization insurance would continue in full force for one year from the anniversary date of the retiree's death for the retiree's spouse at no cost to your spouse. However, within the year period from the date of the retiree's death, should the spouse remarry, all coverage would cease immediately. After the year passes, the spouse may elect to convert to a private plan with Massachusetts Mutual with the cost being borne 100% by the spouse. During your lifetime, you would simply submit your claims for reimbursement to the Company (via the Personnel Department) as you do now. Once converted to a private plan, your premiums and claims would be handled direct with the insurance carrier instead of Woods Petroleum Corporation.

> Secondly, you would be allowed to continue participation in the Group Den-

---

13. Two documents were at issue in *Abbruscato.* One stated, in pertinent part, that retires would be "eligible for *lifetime* health insurance and life insurance coverage." 274 F.3d at 97. The second stated, in pertinent part, that retirees "will be eligible for retiree insurance benefits if you normally qualify or if you would qualify by adding five years to your age and five years to your service. . . ." *Id.* Quali-

tatively, the first description, with its offer of "lifetime" benefits, is arguably more assuring than the language employed by NCR in the documents at issue in this case, but the second certainly is not, and, in any event, this Court has no doubt that both statements would be rejected handily by the Sixth Circuit as constituting "clear and express language" of an intent to vest.

tal Plan at company expense with the same procedure for claim reimbursement as indicated above. *Once you are deceased,* however, there would be no further benefits or automatic rights of conversion to a private plan for your dependents in the Dental Plan.

Third, as a part of our Group Plan coverage, you would also be covered for $10,000 life insurance on you and $5,000 on your spouse with Security Connecticut, with the premiums for these coverages also paid by the Company. Something that you do need to keep in mind, once you become age 65, you would need to submit your claims first to Medicare, as it would then become the primary carrier. You would then submit any amounts not paid by Medicare to Massachusetts Mutual as the secondary carrier. (Be sure that you apply for Medicare upon turning age 65.)

If there is anything else that we can do to assist you with your pre-retirement planning, do not hesitate to call upon us.

*Id.* at 1232–33 (emphasis added). The Tenth Circuit affirmed the district court's holding that this letter manifested a freestanding ERISA plan and that the benefit of lifetime health insurance for the accepting retirees had vested pursuant to its terms.

As to the letter constituting a freestanding ERISA plan, the court found that it met all the minimum requirements of an ERISA writing. This Court need not question the Tenth Circuit's reasoning in this regard, as it is enough to note that the letter at issue in that case contained more explicit details as to how payments were to

be made to and from the plan, including the procedures for receiving benefits, to wit: the retiree would pay his or her costs up front, submit his or her receipts to the plan, and receive 100% reimbursement. In contrast, nothing within the four corners of the three documents upon which Plaintiffs rely in this case specify the claim procedure. (The plan summary merely restates how costs are allocated generally.)

As for the part of the decision concerning vested rights, the circuit court noted that even if the letter incorporated by reference the reservation of rights clause contained in the original plan summary, that clause, which stated that the plan could be changed or terminated, was placed within a paragraph which described the *insurer's* rights, not the employer's rights. 208 F.3d at 1240. In other words, the court found it to be ambiguous whether the employer itself retained any right to alter the terms of the plan. That ambiguity, coupled with the express statement in the letter from the employer that benefits would continue until the retiree's death, led the court to affirm the district court's holding that rights to the benefits had vested. *Id.* at 1241. There are two pronounced differences in this case. *First,* NCR did not express an intent for benefits to continue until a retiree's death. *Second,* no such ambiguity exists in NCR's reservation of rights clause. As discussed, the three documents upon which Plaintiffs rely make it clear that they were to refer to the "current" health care plans for a greater description of their rights.[14] Indeed, the Q & A Form even made express reference to the "Retirement Plan." Turning to the 1993 Retirement Plan, it is clear

---

**14.** The Court reiterates here that because Plaintiffs have made no claim that they did not receive plan summaries for the existing employee welfare plans, or that anything contained in such summaries contradicted provisions of the primary plan documents, it need not address the rule announced in *Edwards v. State Farm Mut. Auto. Ins. Co.,* 851 F.2d 134, 136 (1988). *See supra* note 10.

that "the Company," defined in Part I, Section 1, as NCR, retained the right to change or cancel welfare plan coverage. Furthermore, to the extent it is necessary to consider, Plaintiffs do not dispute NCR's assertion that the same provision was included in the "Retirement Plan" in existence and applicable to them at the time the SPEP was offered.

In *Cecil v. AAA Mid–Atlantic, Inc.,* the District Court of Maryland found that a supplemental retirement agreement between the employer and a single employee constituted a free-standing ERISA pension plan. 118 F.Supp.2d 659, 664–65 (D.Md. 2000). In that case, the court noted that supplemental agreement provided for an ongoing administrative scheme, described the intended benefits, defined the beneficiary class as the employee alone, and established a procedure for the employee to receive benefits, to wit: he would receive them directly from the employer. *Id.* *Cecil* is distinguishable for the same reason *Deboard* is distinguishable: whatever the merit of that court's analysis, the documents upon which Plaintiffs rely in this case are qualitatively different, particularly insofar as they fail to provide a mechanism for receiving benefits. That, coupled with the fact that the language employed by NCR does not constitute "clear and express language" demonstrating its intent for rights in the welfare benefits to vest, deflates the persuasive value of *Cecil.*

In sum, the documents upon which Plaintiffs rely do not amount to ERISA welfare plan documents, nothing contained therein sets forth in "clear and express language" (or even implicit language) that rights in any retirement welfare benefits were intended to vest, and there is no evidence that Plaintiffs entered into a separate bargain with NCR for any additional benefits. Plaintiffs having failed to adduce facts creating a genuine issue as to whether the ERISA plan, the terms of which they seek to enforce, even exists, as to Count I, Defendant's Motion for Summary Judgment is SUSTAINED.

### B. *Promissory Estoppel (Count II)*

■ The Sixth Circuit has held that promissory estoppel is a viable theory for relief under ERISA, 29 U.S.C. § 1132(a)(3). *See Sprague,* 133 F.3d at 403 & n. 13. The following elements must be demonstrated in order to succeed on such a claim: 1) there must be conduct or language amounting to a representation of material fact; 2) the party to be estopped must be aware of the true facts; 3) the party to be estopped must intend that the representation be acted on, or the party asserting the estoppel must reasonably believe that the party to be estopped so intends; 4) the party asserting the estoppel must be unaware of the true facts; and 5) the party asserting the estoppel must reasonably or justifiably rely on the representation to his detriment. *See id.*

■ Plaintiffs' estoppel claim is of no merit in this case. Nothing contained in the three documents upon which Plaintiffs rely can be understood as a representation or promise that the Medicare Supplement benefit, or any other welfare benefit, would vest upon Plaintiffs' acceptance of early retirement. For the reasons already stated, while it was reasonable to accept early retirement for purposes of obtaining the pension plan enhancements, it would have been unreasonable to accept early retirement on the understanding that rights to the Medicare Supplement and other welfare benefits were going to vest. Nothing in the informational documents was ambiguous, and all arrows pointed to the existing NCR Retirement Plans as the source of Plaintiffs' retirement welfare benefits. It would therefore be inappropriate for the

Court to uphold the merits of the estoppel claim. *See id.* at 404 (holding that principles of estoppel are inapplicable where the terms of an ERISA plan are not ambiguous). Doing so would undermine ERISA no less than a finding that the documents created a wholly independent welfare plan. Plaintiffs are upset that a benefit has been taken away from them, and perhaps they have good reason to be upset, but this benefit was never promised in the form of a guarantee, and they therefore have no legal or equitable right to its reinstatement.

Accordingly, as to Count II, for promissory estoppel, there being no genuine issue of material fact to consider further, NCR's Motion for Summary Judgment is SUSTAINED.

### C. *Plaintiffs' Motion for Certification of the Class (Doc. # 15)*

Because the Court has determined that Defendant's Motion for Summary Judgment should be sustained, Plaintiffs' Motion for Certification of the Class (Doc. # 15) is moot, and is therefore OVERRULED.

### IV. *Conclusion*

For the reasons stated in this Decision and Entry, Defendant's Motion for Summary Judgment (Doc. # 19) is SUSTAINED, and Plaintiffs' Motion for Certification of the Class (Doc. # 15) is, therefore, OVERRULED as moot.

Judgment is ordered entered for Defendant and against Plaintiffs.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.